# Yardley *versus* Cuthbertson.

1. In a contest to determine the validity of a testamentary writing, which is impeached on the grounds of testamentary incapacity and undue influence, where it appears that the testator was an aged man, that his mind, originally strong, had become impaired by disease, and that the instrument was prepared by a confidential adviser to whom the residuary estate was given to the great deprivation of legatees named in a former will of the testator, the burden of proof rests on such confidential adviser and beneficiary to show affirmatively that at the time of making said testamentary disposition the testator was informed of and knew the approximate amount of his estate, and the proportionate amount which would pass to his confidential adviser by such residuary clause; and that the testator's mind was free from undue influence exercised by such adviser.

2. No rule can define the amount of such mental weakness which shall impose the duty of explanation, but where a testator, stricken by paralysis, unable to make his signature, allows a codicil to be made by which provisions in his will are reduced to one-fifth the amount, and the residue of his estate, being the largest part, given to the party drawing the codicil, it is not error to charge the jury that in order to support the will such explanation must be proved. The authorities on this subject reviewed and followed.

3. Where a petition for an issue *devisavit vel non* has been refused by the Orphans' Court, and the decree reversed by the Supreme Court, the refusal of the Court of Common Pleas to change the form of the issue sent in accordance with the order of the Supreme Court, is no ground, after a protracted trial, for reversal by the Supreme Court.

4. *Semble*, that while issues *devisavit vel non* in the form now in vogue, making the executors of the disputed will the plaintiffs, are erroneous and ought to be abrogated, in view of the long, unquestioned practice regarding them, they will be upheld.

5. When the issue is as to whether or not undue influence was used to procure testator to execute the instrument in question, it is no objection that the form of the issue requires the plaintiff to prove that there was no undue influence, and that the testator executed the instrument of his own free will.

6. An expert witness may lawfully be asked to express an opinion upon a defined portion, though not the whole of the testimony, not contradictory in itself, and the truth of which is expressly assumed, provided he is first made acquainted with the whole of that upon which he has to pronounce.

7. The admission or rejection of evidence as to matters upon which witnesses have already been fully examined in chief, is no cause of complaint, and in any case lies within the discretion of the court, which is not reviewable.

8. On the trial of an issue *devisavit vel non* the plaintiffs asked the court to charge, that if the testator was of sound mind, and suggested or

directed himself alterations in the will, no presumption arose against the beneficiary under such alterations. The point was affirmed by the court, with the qualification that it is always a ground for suspicion where one, holding confidential relations to the testator, prepares and directs the execution of a will under which he takes a considerable interest.

· *Held,* that this was not error. The confidential relation of the beneficiary to the benefactor is always an important element in the inquiry.

9. Where an issue *devisavit vel non* contains a count of undue influence, to instruct the jury to find in favor of a codicil, if they believed testator was of sound mind and knew its contents when he executed it, would be error, unless qualified so as to leave the question of free will still with the jury.

Argued March 24th and 25th, 1884; re-argued January 21st, 1885. Before MERCUR, C. J., GORDON, PAXSON, TRUN-KEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas, No. 1, of *Phila-delphia county :* Of January Term, 1883, No. 382.

This was an issue *devisavit vel non,* framed by order of the said court, upon a precept issued from the Orphans' Court of Philadelphia county, to determine the following questions, viz.:

1. Whether a certain writing dated December 2d, A. D. 1876, is a codicil to the will of said John L. Neill, deceased.

2. Whether, at the time of the making of said alleged codicil, the said John L. Neill was of sound disposing mind, memory, and understanding.

3. Whether the said alleged codicil was produced by undue influence, fraud, imposition, or duress.

The plaintiffs in the issue were John S. Yardley, Henry E. Busch, and Horace Yardley, the executors nominated in said codicil, and the defendants were James Cuthbertson and James Georgeson and Agnes Georgeson, his wife, in right of the said Agnes and Jeanie Cuthbertson, sometimes also called Jane Grace Cuthbertson; The Contributors to the Pennsylvania Hospital, The Pennsylvania Academy of the Fine Arts, and The Zoological Society of Philadelphia, legatees under the will and codicil.

The Register of Wills originally admitted the codicil in question to probate, as a part of the will of John L. Neill, deceased. Thereupon James Cuthbertson appealed from said decision to the Orphans' Court, averring that material facts affecting the validity of said codicil were in dispute, viz.:

" (1) Whether the said certain writing dated December 2d, A. D. 1876, is a codicil to the will of said John L. Neill, deceased. (2) Whether at the time of the making of said alleged codicil the said John L. Neill was of sound disposing mind, memory, and understanding. (3) Whether the

said alleged codicil was produced by undue influence, fraud, imposition, or duress." And the said appellant, on behalf of himself and others for whom he was attorney in fact, demanded an issue thereon.

The Orphans' Court dismissed the said appeal, and refused to grant the issue as prayed for. Upon appeal, the Supreme Court reversed the decree of the Orphans' Court, and ordered "that the issue prayed for in the court below be granted, and the record remitted for further proceedings." (See Cuthbertson's Appeal, 1 Out., 163.)

Upon the return of the record the Orphans' Court directed its precept to the Court of Common Pleas, commanding that court to cause an action to be entered upon its records between the present plaintiffs and defendants, " so that an issue therein may be formed upon the merits of the controversy between the said parties, and tried in due course, according to the practice of our said courts in actions commenced by writ to determine," the said three questions of fact above mentioned.

The precept having been filed in the office of the prothonotary of the Courts of Common Pleas, and the cause assigned, under the rule, to the Court of Common Pleas, No. 1, application was made to that court to determine the form of the issue and pleadings, so that the burden of proof under the pleadings should rest on the party properly chargeable therewith. The executors claimed that as proponents of the will and codicil they were required to prove, in the first place, only the due execution of the testamentary instruments, and that the burden of proof to show mental incapacity or undue influence rested on the contestants until shifted by evidence. The contestants claimed that the Supreme Court having ordered (in Cuthbertson's Appeal, *supra*) "that the issue prayed for in the court below be granted, the narr. should set up the due execution of the codicil on the first issue; should set up affirmatively that the decedent "was of sound, disposing mind, &c., on the second issue; and that the "alleged codicil was not procured by undue influence, &c., on the third issue; the contestants claiming that the burden of proof on each of said issues was on the proponents.

The court decided this question in favor of the contestants in the following opinion by ALLISON, P. J.

The present contention is over the form of the issues which the Orphans' Court have sent to the Court of Common Pleas to be tried by a jury. The first question is, whether the codicil of December 2d, 1876, is a true and valid codicil to the will of John L. Neill, deceased. The plaintiffs admit that it is incumbent on them to prove the due and formal execu-

[Yardley *v.* Cuthbertson.]

tion of the instrument, but contend that when this shall have been done, they will have made out their case, and that the onus of proof as to the second and third questions rests on the defendants.

This is denied by the defendants, who maintain that it is incumbent on the proponents of the will to take the laboring oar, and establish by satisfactory proof, not only due execution of the codicil, but the possession by the testator, at the time of execution, of a sound and disposing mind and memory, and that the codicil was not procured by undue influence or fraud.

In the case of Boyd *v.* Boyd (16 P. F. S., 283), the rule laid down is that the burden of proof is determined by the specialties of each case. Upon proof of the fact of due execution, the law presumes the possession of testamentary capacity.

The plaintiff, as a general rule, is, in the first instance, required to establish no more than a *prima facie* case. Proof by two witnesses that the signature at the end of the instrument is the true and genuine signature of the alleged testator authorizes the submission of the paper to the jury, with instruction that, nothing appearing in the testimony raising a question as to the integrity of the instrument, or of the testamentary capacity of the party whose last will and testament it purports to be, they should find in favor of the plaintiffs.

This rule is clearly stated in the charge of the court in Frew *v.* Clarke (30 P. F. S., 175). But when, on the presentation by the plaintiffs of their own case, doubt is cast on the genuine character of the instrument, which may appear on the face of the proposed will, as if there are unattested and material interlineations or alterations; these may be in the handwriting of a stranger, and not of the draftsman of the will; they may have been made by one to his own benefit; or if it appear that the will was prepared by a party who takes a large interest under it, and that the testator was aged, feeble in body and mind at the time of execution, suffering under an attack of disease calculated to weaken or destroy testamentary capacity, or that undue influence controlled the mind and and purpose of the testator in such case, as was said in Boyd *v.* Boyd, proof of formal execution of the will is not sufficient. The proponents of the will must go further, and the presumptions which are thus raised against the integrity and legality of the instrument must be overcome by evidence. It must be shown to be the will of the alleged testator, and not the will of some other person who has made it for him (Dean *v.* Negley, 5 Wr., 312). The same principle is recognized in Frew *v.* Clarke. The court say, if the mental

[Yardley v. Cuthbertson]

capacity of the testator had been impaired, if he had become weak from age or bodily infirmity, although not to such an extent as to destroy testamentary capacity, it might have shifted the burden of proof, and required the proponents of the will to negative, by evidence, a presumption of undue influence. The will in that case was sustained; the court below and the court above each holding that there was no evidence of the want of testamentary capacity in the testator.

It was upon the clearest recognition of the application of these principles to this case that the Supreme Court, upon appeal from the decision of the Orphans' Court, refusing the application for an issue, sent the case back for trial, upon the several grounds on which the will is contested. The court say, "had the only question been on the testamentary capacity of John L. Neill, there would be reason to hold that there is not sufficient evidence to justify a jury in setting aside the codicil. Had it been drawn by Neill himself without advice and suggestion, as was the original will it must have stood. But it cannot be disputed that there was evidence, we think enough to carry the case to a jury, that the testator was not the same man, physically and intellectually, when he executed the codicil, as when he made the original will. A jury might reasonably so conclude from the evidence. The onus was thrown on Yardley to prove that Neill fully understood the value of his property and the probable residue after paying all his legacies."

If there was nothing more bearing on the pending question in the case than this decision of the Supreme Court (Cuthbertson's Appeal, 1 Out., 163) ; if we were not, as we think we are, controlled by the principles settled in Boyd v. Boyd and in Frew v. Clarke, we should feel ourselves bound to conform to the decision of the Supreme Court as we understand it, and so frame the questions as to require the plaintiffs to maintain by evidence the affirmative of each one of these issues.

It was upon an examination of the testimony that the Supreme Court have said, it is not enough that the plaintiffs rest content with proving the signature of Neill to the codicil, and hold that more must be proved by them, showing that the codicil expressed the true mind of the testator, freely exercised, and with sufficient comprehension of the value of his property and the probable residue. Without this being shown there is no virtue inhering in the instrument.

We do not feel ourselves required to conform to the view of the present question, urged upon us by the plaintiffs, that we are to look at nothing but the precept of the Orphans' Court in giving form and direction to the issues. On the

contrary, we feel ourselves required to adopt the decision of the Supreme Court in this case as our rule of action; and if there had been no such instruction laid down to guide us, we think we should in some way be required to obtain such light as would enable us to act so as to determine upon whom, under the testimony taken in the cause, the onus of proof ought to rest, as to each one or all of the questions which have been sent to the Common Pleas for trial. Since this case was argued before us, and since the foregoing portion of this opinion was written, the Supreme Court, in the case of Wilson's Appeal (11 W. N. C., 333; s. c. 3 Out., 545), have again affirmed the rule laid down, as we understand it, for our direction in Cuthbertson's Appeal, *supra*, holding that, where the chief beneficiary was the confidential adviser of the testator, and was the main instrument in procuring the preparation and execution of the testamentary paper, he will be required to prove affirmatively the circumstances connected with the drawing and execution of it, and that the testator was laboring under no mistaken apprehension of the value of his property and the amount he was giving to his confidential adviser, and that the gift was his free and intelligent act. All this, in cases like the present one, must be first shown by proponents to entitle them to a verdict in their favor.

The order as to form of the issues to be made in accordance with views herein expressed.

The contestants afterwards submitted to the court pleadings in the following form, viz.: (1) A narr., wherein the said Yardley et al., executors, etc., complained of Cuthbertson et al., contestants, in three counts, each one averring a conversation and a wager upon one of the three several disputed matters of fact (as set up in the original demand for an issue and in the precept); (2) pleas, denying the averments in each of said counts, and tendering issue upon all; and (3) a *similiter* joining in said three issues.

Thereupon the court made the following order:

"And now, April 15th, 1882, on motion of counsel for the defendants, after argument by the respective counsel of the plaintiffs and the defendants, it is hereby ordered that the pleadings in this cause as submitted on behalf of the defendants be filed as the pleadings in the cause." (First assignment of error.)

On the trial, before ALLISON, P. J., the material facts developed by the evidence was substantially as the same are stated in the report of Cuthbertson's Appeal, 1 Out., 165, to which reference may be made. They are also stated, together with instructions on the law, in the charge of ALLISON, P. J.,

infra. (The testimony covered over one thousand printed pages.)

Certain rulings upon evidence and answers to points excepted to are fully stated in the specifications of error, which are reported verbatim, infra.

The following is the charge of ALLISON, P. J., in full:—

Gentlemen of the jury: On the 28th day of April, 1874, John L. Neill made his last will and testament. From all that we have heard, it would seem to be exclusively the product of his own mind and hand. There ought to be but little difficulty in understanding, from an inspection of the contents of this paper, in what manner the testator intended his property should be disposed of after his death. No one would characterize it as otherwise than a most reasonable and generous distribution of his estate among the persons and institutions who were designated as objects of his bounty.

When this will was executed every one of the five children who had been born to the testator was dead; and of all who were of his kindred who had come to this country, one sister only was living, three other sisters and one brother he had buried with his children in this city; nor does it appear that any one of his blood survived in Scotland, the land of his nativity. The only persons, therefore, who were living when this will of 1874 was made, who were the natural objects of his bounty, were his wife and his surviving sister. It is, however, due to his memory to say that no one who appears to have had the slightest claim on his generosity or his justice, was forgotten when he came to make his will.

The testamentary paper was made when John L. Neill was in the possession of an unusually vigorous body and of an equally strong mind. He is described by the witnesses as being not only clear in understanding, but as most tenacious in his adherence to a purpose when it was once formed. Nothing is hazarded in saying, that when that will was completed, it contained the well-considered and fully-matured expression of the testamentary intentions of John L. Neill.

I call your attention in this manner to the will, and to the characteristics and surroundings of the testator at a time when no one could question that he possessed undoubted testamentary capacity, for the reason that, in making up your judgment upon the material questions which you will be called on to decide, you will say whether this will of 1874 contains a statement of the entire testamentary mind and purpose of the testator, or whether that purpose, as therein expressed, was changed in the manner set forth in the codicil of the 2d of December, 1876.

12 OUTERBRIDGE—26

[Yardley *v.* Cuthbertson.]

The controversy is not over the fact of the mere formal execution of the codicil. The paper is signed at the "end thereof" with the mark of the testator; a mark being in law of the same effect as the full name. The proof of acknowledgment and signature has been made by more than two credible witnesses.

Passing on from the fact of formal execution, you are required to enter at once upon the consideration of the question, is the paper of December 2d, 1876, a true and valid codicil to the will of John L. Neill? Does it contain the correct expression of the intelligent and uncontrolled mind of the testator? Intelligent in the sense of having been executed with a full understanding of what is contained in it; of the estate disposed of, as well as the persons and objects to whom it is given; and uncontrolled in the sense also, that of his own will and accord, without coercion or constraint, he freely executed the paper in question.

The constraint which will make void an instrument of this character may consist of either actual physical force, or the exercise of what the law characterizes as undue influence, which is generally classed with fraud, and when carried to an extreme point, is regarded as actual fraud; as when a testator is forced to make a will, by the pressure or power of another exercised over him, so that he feels himself compelled to do that which he would not have done if he had been left to the free exercise of his own free purposes and desires. It must, however, be shown to have controlled or coerced the mind of the testator, and that it operated at the very time of making or executing the testamentary paper. Suggestions, requests, persuasion, do not of themselves constitute undue influence, but if these means are steadily and persistently employed, so as to overcome the will and purpose of a testator, and secure that to be done which he did not wish to do, and which he would not otherwise have done, it would amount to an illegal restraint, which would render the testamentary act void. The protection which the law throws around a person who is about to dispose of his property by will is, that his disposition of that property shall be what it professes to be, literally *his* will; the true statement of what he wills or prefers or desires to do with his estate. Where fraud or undue influence is charged it must be proved by the party setting it up; and what will or will not amount to undue influence is always a question of fact, to be determined from the evidence, having reference to the specialties of each case as it is presented to the consideration of a court and jury. For that which might fairly be believed to have had no influence upon one who is in the full possession of mental and bodily vigor, may very safely be re-

[Yardley v. Cuthbertson.]

garded as having unduly controlled the mind and purpose of a person broken in health, weak in body and mind, enfeebled by age, so that of necessity almost, the activities and wakefulness of the mind must have become more or less diminished, and in many cases greatly impaired. It is the misfortune of persons often to outlive not only the enjoyments of life, but the power even to help themselves, when second childhood comes again, and their simplest wants must be supplied by others; with bodily powers impaired and the mental vision dimmed, it is not difficult to understand how easy it may be to bend the will under such circumstances so as to make it conform to that of another. And if it be shown that upon one thus enfeebled the pressure and authority of a strong and imperious will has been brought to bear, even though there be nothing approaching command or direction, and if the power, as exercised, take no more than the form of repeated suggestion, if it operates to control and direct the mind against its own purpose and desire, such a will ought not to be allowed to stand. Especially is this so, if distracting statements and motives, tending to produce uncertainty, fickleness, and confusion of purpose, have been presented at the time to the consideration of a testator.

All this, it is claimed by the defendants, has been established by the testimony in this cause, and even more than this; that situate as John L. Neill was on the 2d of December, 1876, he was induced to act on false premises; that he was led to believe, and did believe, that, by reason of the death of his wife, it was necessary to alter his will, and that in yielding to this necessity, which he supposed existed, in his enfeebled condition, with body broken and mind clouded, he submitted to the direction of John S. Yardley, who then wrote his own mind and purpose into the codicil, which changes and revokes much of the mind and purpose of John L. Neill as it is expressed by himself in the will of 1874. This, the defendants contend, is shown by the testimony of Miss Lambert, by the recitals in the preamble to the codicil; but perhaps, more than all, by the testimony of Dr. Drysdale, who said that the testator told him, on the morning of the 2d of December, when he asked him to be witness to this codicil, that it would be necessary to alter the will on account of the death of his wife. Miss Lambert's testimony is, that to ascertain whether such alteration of the will was necessary for the protection of her interests, and for this purpose only, John S. Yardley was sent for, and that all that followed his appearance on the evening of December the 1st, other than this, was exclusively his work, done by himself, without suggestion or instruction from the testator. This, the defendants have asked you to say, in

[Yardley *v.* Cuthbertson.]

the explanation of what they characterize as the otherwise un-accountable provisions of this codicil, which so largely reduces in amount the legacies which he had, after mature consideration, bestowed on the children of his friend, Mrs. Cuthbertson, and upon charities and public institutions of the city of Philadelphia. And that this is the only explanation that can be given, except that stated by John S. Yardley himself, of the introduction of the residuary clause into the codicil, whereby so large an amount of money, several hundred thousand dollars, will pass to him if this codicil is sustained. The defendants ask you to set aside this codicil, because, when viewed in the light of all that surrounds its preparation and execution, judged by a change of testamentary purpose, sudden and revolutionary, no intention having been shown to make any change in the will prior to the visit of John S. Yardley on the 1st of December. And, considered in the light of Miss Lambert's testimony, that all the changes were suggested by John S. Yardley, to which the testator expressed neither assent or dissent, that all this indicates either a want of testamentary capacity in the testator, or that the codicil was procured by fraud and undue influence on the part of Yardley. If such is your opinion, founded on a consideration of all the evidence in the cause, your verdict should be in favor of the defendants on all of the issues you have been sworn to try.

You are not to forget, however, that there are two sides to this particular phase of the question. That John L. Neill was old, in his seventy-eighth year, the plaintiffs do not deny; that he had been twice, at least, visited with paralytic affection before the 2d of December, 1876, and that he was thereby rendered, to some extent, helpless is unquestioned. That he was greatly prostrated by distress of mind because of the recent death of his wife is not disputed; that he required the care and attention of others at that time the evidence most clearly proves; but placing before you the testimony of John S. Yardley, which is a positive contradiction as to most of the material transactions, as testified to by Miss Lambert, of the evening of the 1st and of the morning and evening of the 2d of December, at 1425 Arch street, when John L. Neill, John S. Yardley and Miss Lambert were together; they ask you to say that there is no proof of want of mental capacity in the testator, or of fraud or of undue influence exercised over the mind of John L. Neill at the time when the memorandum for the preparation of a codicil was made by Yardley, or when the draft of it was read to the testator, or when the codicil was executed. This evidence is pressed on your attention, to be considered along with all the other testimony

[Yardley v. Cuthbertson.]

which shows, or tends to show, testamentary capacity, espe-
cially the testimony of Dr. Drysdale and that of the subscrib-
ing witnesses to the codicil. This, the plaintiffs most earnestly
contend, shows full and entire testamentary capacity; that all
that was done was the exercise of the free and uncontrolled
mind of the testator, and that upon either of these grounds
your verdict should be given for the plaintiffs, thereby estab-
lishing the codicil as a lawful and valid part of John L.
Neill's will. It will not be out of its proper connection for me
to say, that it is wholly unimportant that assent was given to
the acknowledgement of the paper when it was executed as a
codicil by a nod of the head, if at the time of so doing the
testator was in possession of that degree of intelligence which
is required to made a valid will. The testimony does not
make clear whether he assented by word or by an affirmative
nod, and this point, as to whether he assented at all, and, if he
did assent, in what manner it was done, is for your determina-
tion under the evidence.

The point to which it is proper for me now to direct the
attention of the jury is what is understood by the phrase tes-
tamentary capacity. It may be stated as a general proposition,
that if a testator, when he writes or dictates a will, is possessed
of sufficient mind and memory to understand and direct the
business in which he is engaged, he can perform a valid testa-
mentary act. In ordinary cases, and as a general rule, mere
feebleness of intellect, which does not deprive a testator of an
understanding of what he intends to do with his property, is
insufficient to invalidate a will. This is also true of one who
entertains erroneous, foolish, and even absurd ideas on some
subjects, unless such vagaries of the mind operated on the
testamentary disposition of his property, the mind being other-
wise apparently sound and clear; yet if a will be the result of
such insane or absurd delusions it cannot be sustained. Courts
have gone very far in the effort to sustain wills, where there is
no good ground on which to question the bona fides of the
transaction, and where it appears that a testator had intelli-
gence enough to know what he was doing, and that the act was
free and uncontrolled. This at times may only be seen as through
a glass darkly; yet if so much can be made to appear, a testa-
mentary disposition of property will be sustained, in support
of the right to direct its use and enjoyment after death, by one
who in his lifetime possessed absolute dominion over it. It
has, therefore, been held that a person advanced in years, en-
feebled by disease, and mentally not as strong as when in pos-
session of full bodily vigor, may possess sufficient understanding
to make a valid will.

A lunatic even may make a good will, if it be shown that it

[Yardley *v.* Cuthbertson.]

was executed when he enjoyed a lucid interval, and at the time was in possession of his faculties, so that he fully understood that he was disposing of his property, of what, in substance, it consisted, and to whom he desired to give it. But, of course, every such will demands the closest scrutiny, and must be sustained by full proof before effect can be given to it. And this is true of every case which lies on the border line. Where there is room for doubt as to the possession of mental capacity, and where there is ground to question the integrity of a testamentary paper by reason of alleged fraud, or undue influence practiced on a testator, every consideration of right and of fair play demands that courts and juries should see to it that, as far as lies in their power, no device of cunning or corruption shall be permitted to achieve a success through the instrumentalities of the law. Nor should a proper consideration of the principles to which I have adverted turn away your attention from what, after all, is of the greatest importance in this search after general testamentary capacity. You should say, as gathered from the evidence, whether John L. Neill, on the evening of December 2d, when the codicil was executed, was possessed of mind and memory sufficiently sound to enable him to dispose of his estate with understanding and judgment. A testator may possess intelligence sufficient to enable him to perform an act of business; he may know enough to make a valid deed, to receive and receipt for a debt, or collect a dividend, and yet he may be without sufficient capacity to dispose of an estate of large value, consisting of many items, divided among many legatees, and especially where such testamentary act materially changed a will previously made. Whether such was the mental condition of John L. Neill when this codicil was executed, is for your determination.

I have called the attention of the jury to some of the mental and physical conditions of a testator which do not disqualify him from making a will; let me now ask your attention to what has been well defined as constituting a good and sufficient testamentary capacity. A disposing mind and memory in the view of the law, said Judge KING, in Leech *v.* Leech, is one in which the testator is shown to have had, at the making and execution of a last will, a full and intelligent consciousness of the nature and effect of the act he was engaged in, a full knowledge of the property he possessed, an understanding of the disposition he wished to make of it by the will, and of the persons and objects he desired to participate in his bounty. This definition is clear, concise, and yet comprehensive. It has been more generally approved and adopted by the subordinate courts, as well as by the highest court of our Commonwealth, than any other I can now call to mind or refer to, and

I therefore adopt it and give it to you for your guidance in passing on the question as to whether John L. Neill, on the second day of December, 1876, was in the possession of testamentary capacity sufficient to enable him to execute the codicil to his will which bears that date.

Recalling your attention to the definition which I have just read to you, you must say whether it has been shown that John L. Neill, at the time of executing the codicil, had, first, a full and intelligent consciousness of the nature and effect of the act in which he was then engaged ; in other words, did he know that he was executing a codicil to his will, and to what persons and objects he was giving it, and in what proportions he was distributing it? If he understood this he understood all that is meant by the phrase—the effect of his act. The law does not require that a testator should understand the legal effect of the separate clauses of his will. In the second place, had he a full knowledge of the property he possessed? I do not understand this to mean that he must have at the time an absolutely accurate knowledge of all and of every separate portion of his property, but that he should know substantially the value and extent of it, and that it would pass under his will to the persons and objects named in the will, and in the amounts and proportions as it is therein designated.

Applying these principles to the facts, as they have been proved before you, of the physical condition of John L. Neill, on the second day of December, 1876, that he was relatively an old man, in the seventy-eighth year of his age, that he suffered from two or three strokes of paralysis, from which he was physically infirm, and that he had been affected by great sorrow ; these facts, though clearly proved, do not necessarily carry with them the inference of the destruction of testamentary capacity, for all these conditions may exist and yet the mind may remain to a great extent unaffected, and the will may retain its former power of independent and resolute action. This testimony which relates to the physical condition of the testator is, however, to be considered in connection with all other statements which have been testified to of the infirmities and sufferings of the testator, the effect which they produced upon his intellect; whether they established as a fact the impairment of his mind to an extent which deprived him of the power to perform a valid testamentary act, you, from the evidence, must determine. So far as you shall find facts proved which tend to establish physical infirmity, all are to be given their due weight in making up a judgment upon the whole case as it now stands before you under the evidence. And this is so, because of the intimate and mysterious relations which exist between body and mind. The serious impairment

[Yardley *v.* Cuthbertson.]

of the one is often the cause, remote or proximate, of the weakening or destruction of the other. Upon this acknowledged condition of human experience and infirmity, is founded the rule which permits evidence to be given in all investigations touching mental capacity of everything that may have affected injuriously either the body or mind of a testator. That which has occurred before as well as that which follows an act, the validity of which is called in question, because of a want of mental capacity in the person by whom the act was performed.

A most material question, as I have already said to you, where the possession of general testamentary capacity, or the want of it, is the issue to be determined, points to the precise time when the will was executed. If a testator is shown to have been then competent to make a last will and testament, it will stand, even though it is satisfactorily proved that before and after that time he was wanting in that degree of intelligence which is required in order to make a valid will. And where due execution is shown, the presumptions are in favor of testamentary capacity. The burden of proving the contrary is cast on the contestant, sanity being the rule and insanity the exception. This is an established rule of law in its general application to contests over last wills. Due execution of this codicil having been proved, to overthrow these legal presumptions it is necessary to establish want of testamentary capacity; the evidence should show to your satisfaction that John L. Neill did not possess capacity to make a codicil to his will on the evening of the 2d of December, 1876. If you are satisfied that such was the condition of his mind at that time, it will be unnecessary for you to enter upon the consideration of the other, and which you may find to be the most material point in the cause; for if this codicil is nothing more than a paper correct in form, but wanting the more essential element of a valid will, if it does not contain a correct statement of the testamentary intentions of John L. Neill, freely and voluntarily executed at a time when his strength of mind and memory were equal to the purpose of understanding the contents of the codicil, then it is not valid—it is not a true codicil, and it is to be regarded that, although possessing the legal requisites of form, it is without substance. Such a paper, as Swinburne quaintly expressed it, is no more a will or a codicil than a painted lion is a lion.

And now, gentlemen, if you shall be of the opinion that John L. Neill, on the second day of December, 1876, was possessed of a sufficiently sound, disposing mind, memory, and understanding to enable him to make a will, you will yet be required to say whether his mental faculties were unimpaired, or whether they were weakened or enfeebled. It is usual in

[Yardley v. Cuthbertson.]

an inquiry of this character to seek for a cause which may explain a disordered or impaired condition of the intellect, but it is comparatively unimportant what agency may have produced that result, if it is, in the apprehension of the jury, shown to exist.   An impaired intellect may be evidenced by the declarations and actions of one whose bodily condition, as far as medical science even can ascertain, may apparently be healthy and sound.   But where a mind is found to be off its balance or weakened, and there exists an explanation of what otherwise might be shrouded in mystery, it is both natural and reasonable to turn to existing, self-evident facts, which justify the conclusion that they are in themselves the true exponents of a mind which gives to every one witnessing its operations the proof that it is impaired.   But facts to which we often turn as affording satisfactory proof of an existing cause to which the mental condition may be attributed, may often be found to exist without, in any degree, or at least in any apparent degree, affecting the mind.   Sickness, grief, accident, or old age may all exist in the same person, and yet the mind remain not only clear in its perceptions but sound in its conclusions, and the memory may, to no appreciable extent, be affected.   But if there is reason to conclude that a person who is old, who has suffered great sorrow, been stricken with an incurable malady, which is calculated to impair the mental faculties, has become weakened in mind, so that intellectually and physically he has changed for the worse, though he may not have lost his reason, it is a legitimate conclusion that such a combination of circumstances have produced their natural results.   Physical decay and mental distress are in themselves sufficient to explain a weakening or giving way of mental faculties, and if to this is added old age, as where one has passed the allotted period of life, the basis for a belief that the mind is impaired is greatly strengthened.   It is a combination of circumstances of this character, shown to exist in this case, upon which the defendants rely in asking you to find, as a fact borne out by the evidence, that the mind of John L. Neill had become, to a considerable extent at least, impaired ; that he was not the John L. Neill of former days.   This, they contend, is shown by the successive strokes of paralysis which fell upon him with such marked effect, each time plugging up one of the smaller vessels which carry nourishment to the brain, progressively, step by step, depriving him of the use of his former bodily powers, when literally, after the first stroke of paralysis, his right hand forgot its cunning.

The contention is, that when to this manifest breaking down of the body is added the almost overwhelming distress and grief occasioned by the sickness and death of his wife, the con-

clusion is clearly established that when this codicil was executed there was a great weakening of the mental faculties. And that this was shown by the helplessness of the testator, by his conduct as they have attempted to prove it before you, by his want of a proper understanding of that which was spoken or read to him, and by what they contend is the wholly unreasonable proceeding on his part, in connection with the making and executing of this codicil. The contention of the defendants further is, that this paper contains the expression of the mind of John S. Yardley, and not that of John L. Neill, who, they claim, did not direct or even understand its contents, and that if he had any understanding of what is written in the codicil, he was overborne in his enfeebled condition and his will controlled by that of Yardley, who inserted in it the clause which gives to him or his heirs the great bulk of the fortune which the testator had spent a lifetime in accumulating. This case has recently, in one of its aspects, received consideration by the Supreme Court, and they have sent it here with the direction that a jury should say whether John L. Neill was intellectually the same man when he executed the codicil as when he executed his original will. If the jury shall find that his intellectual powers had become impaired or weakened from any of the causes mentioned, or from any cause whatever, then, the court say, " the onus or the burden is thrown on Yardley to prove that Neill fully understood the value of his property, and the probable residue after paying all his legacies." This is founded on the admitted fact that Yardley stood toward John L. Neill, on the 2d of December, 1876, in the relation of a trusted and confidential agent, having been sent for to advise on subjects connected with a testamentary disposition of his property. Yardley says he was instructed to prepare a codicil to the will, in which, however, he is contradicted by Miss Lambert, who asserts that the only purpose of sending for Yardley was to settle a doubt which had suggested itself to her mind, and which she communicated to Mr. Neill, whether the will, as she expresses the thought, would hold the same for her as if Mrs. Neill had survived her husband. The fact of mental impairment once established in a case like the present one, in which the confidential adviser takes a large benefit under the codicil, if it is established, shifts the burden of proof, and requires him to make it clear to the satisfaction of the jury, not only that the testamentary act was freely and voluntarily performed, but that it was performed by the testator with an intelligent understanding, not only of the value of his property, but also to what extent the draughtsman of the will would be benefited by any provision in his favor. Where, as in this case, it is a bequest of the residue of the es-

tate, the testator must understand clearly the amount, probable or proximate, at least, of his residuary estate, which would pass to his confidential adviser.

The general rule, as I have already stated it, undoubtedly is that testamentary capacity and knowledge of contents of a will are presumed to be possessed by the person executing a will or a codicil; and where such presumptions come into play, the party who alleges fraud and undue influence must take upon himself the burden of proving it. In such case the undue influence must be such as to destroy the freedom of the will, or, at least, to bring it under control. But not so, say our Supreme Court, in the case of an old, infirm and mentally weak person, disposing of his estate in favor of his confidential adviser. This rule of law has recently been asserted three times in no doubtful terms. The last emphatic announcement of the doctrine is found in this case, reported as Cuthbertson's Appeal, so that we are not left to uncertainty or doubt of the present state of the law of Pennsylvania on this subject. We do not know that there is any substantial difference between the doctrine as laid down in the English cases from that which is contained in our own; but with us it may now be safely affirmed that it may be more than a suspicious circumstance that a scrivener or attorney prepares a will with a considerable legacy to himself; and more than vigilant care may be demanded by the circumstances connected with such a case; nor is it going too far to say that it is demanded in every instance where there is reason to believe that the mental faculties of a testator have become weak. But even when there is not evidence to show that the testator was of weak mind at the time of the execution of the instrument, when a will is procured or written by one interested in its provisions, an additional burden is imposed on those claiming to establish a will under such circumstances, proof of a more clear and satisfactory character is required, for the reason that if a party writes or procures a will to be written, under which he takes a considerable benefit, this in itself is a circumstance sufficient to excite suspicion, requiring explanation; courts and juries should make haste slowly in establishing such an instrument, and, as a rule, should require clear proof of the honesty of the alleged testamentary paper before giving effect to it as a valid will. This, of course, can only be done when a contest is waged over the legality and bona fides of the transaction by parties who have an interest in the estate of which it professes to make a disposition.

It has been well said a court ought not to pronounce in favor of such a will unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the

true will of the deceased. The facts to be proved in such case are, that the party executing the will clearly understood and freely intended to make that disposition of his property which the instrument purports to direct.

It is incumbent on the proponents of a will in every such case to do more than prove formal execution; they must take up the burden of removing the suspicion with which every such transaction is justly viewed, and this imposes on them, in the first instance, the obligation of proving due execution, and also that the testator clearly understood what disposition he had made of his property.

But in the case as it is put by our Supreme Court, where old age and bodily infirmity and sorrow have pressed with a heavy hand on one who executes a testamentary paper, and impairment of the mental faculties is either apparent, or the jury may find it as a fact fairly to be inferred from the evidence, the attorney or scrivener, or other person standing in a confidential relation to the testator, who has written himself or his family into the will for a large interest, must not only prove the legal execution of the instrument, and remove the suspicion with which the law looks at such a transaction, even when the testator is of sound mind, but he must go further when the mind is impaired, and show clearly that the testator understood the nature of the testamentary disposition he was making of his property, which includes a knowledge of the value of his estate, and what amount will pass by the will to the attorney or scrivener who prepared it. The Supreme Court say every man who draws a will in his own favor, under such circumstances, should know that he will be required to prove affirmatively all the circumstances connected with the drawing of the will, and that it must appear that the alleged testator was laboring under no mistaken apprehension as to the value of his property, and the amount he was giving to his confidential adviser.

The court further say, there was evidence enough to carry this case to a jury that the testator was not the same man, physically and intellectually, when he executed the codicil as when he executed the original will. A jury might reasonably so conclude from the evidence.

I do not understand this passage of the opinion to contain an assertion that John L. Neill was not the same man, physically or intellectually, when he executed the codicil that he was when he executed the original will. The court intend to say, that upon the evidence which was before them, there was sufficient to raise a question to be decided by the jury, whether, physically and intellectually, the testator's condition had changed for the worse.

[Yardley v. Cuthbertson.]

Then the court say the onus was thrown on Yardley to prove that Neill fully understood the value of his property, and the probable residue after paying all his legacies.

That which gives especial significance to these principles of law as applicable to the case now on trial is, that the language as just quoted, was enunciated in this estate when questions connected with it went up on appeal from a decree of the Orphans' Court, and we need look no further for a safe and true rule by which to be guided, in endeavoring to arrive at a correct conclusion upon the questions of fact which are to be determined by your verdict.

The court hold that a testator may be in the possession of his mental faculties amply sufficient to enable him to make a will, yet if shown to be weak in mind, from what cause it matters not, and the person whose advice has been sought and taken receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the dispositions contained in it.

The court, as you will perceive, do not contemplate a case in which the mind is destroyed, but where the testator is weak in mind, whether that be his natural condition, or whether such mental weakness is the result of old age, bodily infirmity, great sorrow, or other cause tending to produce such weakness.

In every such case the agent who is thus benefited must make it clear that the act is not only the free, but that it was the intelligent act of the testator. Such intelligence must embrace not only a knowledge of the property to be disposed of, but how much of it the confidential adviser or agent would take under the will. Before Cuthbertson's Appeal, this question had been considered in the case of Boyd v. Boyd. It was there held that the legal presumption is, in the case of a testator who is of weak mind, that an agent, or friend, or adviser who thus benefits himself exercised an undue influence over the mind of a testator, and, in so doing, has abused the confidence reposed in him. And this inference is all the more legitimate where he is not of the blood of the testator, or is not related to him by marriage. This presumption is founded on the fact that it is contrary to that which is usual and customary under such circumstances; but this presumption is greatly lessened when it appears that the testator is without kindred or relationships, which was the case with John L. Neill, for then there are none who have claims as the natural objects of his bounty. Still, it cannot, we think, be held that the presumption does not, in some degree, hold in every such case, because it is of the highest importance that every mentally weak person should be protected, especially if he be aged

and suffering under bodily infirmity, against that class of persons who are designated by the Supreme Court as the cunning and the crafty. In Boyd's case it was held that the scrivener was derelict in his trust, in not explaining to the testator how much he would take under the residuary clause of the will. The court say the scrivener should have placed before Boyd a calculation, showing what the residue given to the executor would probably be ; and add, in the relation in which he stood, it was incumbent on him to have done this. This was said in the case of a man seventy-two years of age, who was not prostrated by sickness, who went to the house of the scrivener, and asked him to write his will, who, though spoken of as rather of weak mind, had been a successful man in the conduct of his business, had accumulated a fortune amounting to $30,000. He was illiterate ; could not more than read and write his name. It was in a case of this kind that the Supreme Court applied the rule of presumption against the scrivener, and held that it was incumbent on him to show to the satisfaction of the jury full knowledge on the part of the testator of the contents of his will, and how much he (the scrivener) would take under its residuary clause. Boyd *v.* Boyd is not in all respects exactly like the present case ; this case in some of its features is weaker, and in others a much stronger case than Boyd *v.* Boyd, to which the principle of presumption against a scrivener and residuary legatee was applied. I do not understand the plaintiffs as denying the correctness of this proposition ; they have, therefore, addressed themselves to the necessity of satisfying you that the testator's mind was not weakened or impaired on the second day of December, 1876. This, they contend, is fairly to be regarded as established upon a consideration of all the evidence in the cause, especially that portion of it which covers the preparation and execution of the codicil.

If you are satisfied that the testator's mental force had not abated, that his mind had not become weak, and that neither fraud nor undue influence had been practiced on him, and that his codicil contains the true testamentary purpose of John L. Neill, your verdict should be in favor of the plaintiffs. But if you find that the testator's mind had weakened, then a plain and manifest obligation rests on the plaintiffs to make it clear that this is the free and intelligent act of the testator—free in the sense that the codicil contains his own uncontrolled purposes and desires, that the undue influence or management of John S. Yardley was not the agency which brought about the material changes which the codicil effects in the previously expressed testamentary purposes of the testator, as they appear in the will of 1874. And intelligent, in the meaning

[Yardley v. Cuthbertson.]

that John L. Neill understood, not only the property he possessed, but the amount he was giving to Yardley. Nothing short of this will satisfy the requirements of the law which is applicable to this cause.

The obligation which is imposed on a confidential adviser, under such circumstances, does not trench on the admitted doctrine that a will is not to be overthrown when it is clear that the person executing it was of sound mind and understood its contents, and was not unduly influenced. Nor does it matter that the person benefited is not related to the testator. To every one who is of a sound mind is given the right to dispose of his property in any manner he may deem proper, either by gift or devise, and if the act is free from fraud or undue influence, it is not legal to make the adviser or scrivener or confidential friend the chief or sole recipient of a testator's bounty. The two recently decided cases of Frew v. Clark and Harrison's Appeal, which were cited in your hearing, amply sustain this view of the law, if recent decisions of our own Supreme Court are at all necessary to give emphasis to a doctrine or principle of the law which has been so long and so repeatedly maintained. In each of these two cases the testamentary paper was in the handwriting of the person who, for himself or for his family, took a large interest under it. But in each instance, the testator being at the time in good health, and there being the most ample proof, not only of undoubted testamentary capacity, but that in neither case had the mind become weak, and there being nothing to support a charge of fraud or undue influence, the will in each case was supported—in the latter instance without sending the case to a jury.

I repeat the proposition that it is not illegal or contrary to the policy of the law to permit an attorney or scrivener, who draws the will, to take a large interest under it, where mental capacity is clear and the act is shown to be the free and intelligent act of the testator. We have nothing to do with the wisdom of the law which permits this to be done, nor can a will be set aside because it is, in our judgment, unreasonable or unjust in its provisions. If it possesses all the requisites of a last will and testament, it is to be carried into effect. The rule is well stated by LOWRIE, C. J., in Dean v. Negley, 5 Wright, 318, when he says the will of a man who has testamentary capacity cannot be avoided merely because it is unaccountably contrary to the common sense of the country. This will, if not contrary to law, stands for the law of the descent of his property, whether his reason for it be good or bad, if indeed they be his own, uninfluenced by un-

lawful influence from others. But yet every will like the present one, executed under the circumstances which are shown to have surrounded the preparation and execution of this codicil, or under strongly analogous circumstances, where an estate of considerable value is largely given to the person who drew the will or codicil, and where the mind has become weak, starts with a cloud of suspicion surrounding it, and upon such person rests the obligation of showing not only the possession of testamentary powers, but that the testator knew how much he was giving to the attorney or scrivener.

The first of these necessities the plaintiffs claim they have established beyond doubt, and they ask to find as a fact proven in the cause that on the evening of the 2d of December, 1876, the testator was possessed of a sound and disposing mind, memory and understanding; that he understood perfectly what he was doing; that his mind was not weak, and that the execution of this codicil was not only his free, but that it was also his intelligent act. You are to find whether these conclusions are supported by the evidence.

Upon the second proposition, namely, full knowledge by the testator, not only of the value of his property, but also what proportion of it he was giving to John S. Yardley, the contention of the plaintiff is that, having shown that testator's mind had not failed, that in the language of Doctor Drysdale, it had not begun to give way, they claim that they have done all that the law requires them to do; and that this, taken in connection with the proof of actual knowledge of the contents of the codicil by Neill, as shown, first, by the instructions given by the testator for its preparation; second, the reading of the draught by Yardley to him on the morning, and of the engrossed codicil on the evening, of the 2d of December; and third, by the reading of the will and codicil to Neill again by Miss Lambert on the 4th of December, and there being no proof of fraud or undue influence practiced on the testator, your verdict should be in favor of the plaintiffs on each one of the issues. This is, I think, a sound proposition of law, if you find, upon the consideration of the entire evidence, that all that plaintiffs claim has been established by the proofs. This assumes, however, the proof of unimpaired mental powers, and gives credit to the statement of Yardley, that the instructions for the preparation of the codicil were given to him by Neill exactly as he has embodied them in the instrument, which statement is flatly contradicted by Miss Lambert. It assumes, as proved, also, that Yardley read this codicil, just as it now stands, in all its parts to the testator on the 2d of December, which statement depends wholly on the credit which you give to his testimony; no other witness is able to

[Yardley v. Cuthbertson.]

say that he did. And it is beyond question that the evidence does not show that Neill read it or attempted to read it, nor was he requested to read it by Yardley. It also assumes that Neill had a full understanding of how much he was giving to his scrivener when the codicil was read to him by Miss Lambert on the 4th of December.

If the plaintiffs have not been able to support their claim of the possession by Neill of full knowledge of the practical effect of the residuary clause of the codicil, upon this basis— the basis of a mind that had not become impaired—you are to say whether, by the evidence, they have been able to support it at all. No one pretends to say that at any time an explanation was made to the testator of what would be the effect of the residuary clause of the will, which gives to Yardley all that remains after paying the reduced legacies; what that residue would probably amount to; nor was anything said about the value of the estate of which the testator was then disposing. Nor is it pretended that following the course which the Supreme Court said should have been pursued in Boyd v. Boyd, was a statement made out and laid before the testator, showing the amount of his property and how much Yardley would take under the codicil. Miss Lambert says that no such explanation was made by any one. Yardley says that he did not give any explanation to Neill of the amount which would probably be taken by him under the residuary clause. The subscribing witnesses did not attempt to enlighten the testator on this or any other point when the paper was executed. Miss Lambert further says, that Neill said, I give John S. Yardley $10,000, which, if true, and that you are to decide, would go very far toward showing an entire misapprehension on the part of the testator of the practical effect of this residuary clause, and is wholly inconsistent with the theory on which the plaintiff's case rests, that Neill knew perfectly what he was doing, his mind being as clear and strong as it ever had been, and that he fully understood how much he was giving in the form of legacies, and that the entire balance of his property would go to Yardley. If Neill's mind was unimpaired, and the law implies that he knew all this, and not only that he knew it, but that he intended to make just such a disposition of his estate as is contained in the codicil. But, if he said I give John S. Yardley $10,000, it will be very hard to reconcile that statement with the belief that he understood at the same time that he was giving him several hundred thousand dollars. If his mind was impaired from any cause whatever, the plaintiffs have failed to show that the slightest attempt was made to enlighten the testator, or to explain to him the practical outcome to Yardley under

12 OUTERBRIDGE.—27

this residuary clause, or that he knew it without such explanation. In the latter contingency this was a duty imposed on Yardley which he did not perform.

As the Supreme Court said, in Boyd *v.* Boyd, I say to you, applying it to this case, if you find that John L. Neill's mind had weakened under the effects of age, a serious affection of the brain, loss of bodily vigor and grief over the death of his wife, or from any other cause, this throws upon the plaintiffs in the issues the necessity of showing that the provisions of the will were fully explained to and were understood by the testator, and were fully assented to by him; or, what would be a full equivalent for such explanation of the contents of the will, namely, clear and satisfactory proof that such explanation was not necessary, the testator himself, by his statements or declarations, or by specific instructions in regard to his will, having shown that he thoroughly understood the value of his estate and how much would remain after the legacies were paid. Anything short of this would not satisfy the requirements of the law as it is laid down in Boyd *v.* Boyd, and in Cuthbertson's Appeal. That which may, I think, be substituted for the statement spoken of in Boyd *v.* Boyd, does not meet literally the requirements of that case; but, while that which the court have there said is of no uncertain sound, I regard it more in the light of a statement of what would be advisable or proper to do in similar circumstances, so that the information given to a testator might afterwards speak for itself, being in writing, and in the form of a statement easy to be understood; but if it could be shown that this was wholly unnecessary, because it appeared that the testator showed by his declarations full knowledge of his estate, what he wanted to do with it, of what it consisted, and how much would remain after paying legacies, I do not understand that what is said in Boyd *v.* Boyd, of what ought to be done, is in all cases to be followed where a necessity for so doing does not exist.

This case, you will therefore see, hinges to a great extent on the possession by the testator of a mind that had not weakened or become impaired on the 2d of December, 1876; this implies the retention of memory, understanding, and will, and is therefore to be decided mainly by the evidence in the cause which bears directly or indirectly on this question.

If you believe it has been shown that the testator's mind had not become impaired; that his memory and understanding retained their full powers; that his will was as resolute and unyielding as before he was stricken with what Doctor Drysdale characterizes as an incurable malady, your way would seem to be clear in rendering a verdict in favor of the plaintiffs on all the issues; first, that this is a true codicil to

the will of John L. Neill; second, that he was of sound and
disposing mind when it was executed; and third, that it was
not obtained by imposition or fraud; for if all that Miss Lam-
bert has testified to, of the part taken by Yardley when he
met the testator at his home, on the 1st of December, is true,
it would not amount in law to the exercise of undue influence
over such a mind and will as were possessed by the testator
when he was in full possession of his faculties. According to
her testimony, that which he said amounted to no more than
suggestions, which he was legally authorized to make, and if
not pressed to such a degree as to control and overcome the
purpose of the testator, it would not amount to undue influ-
ence which would render this codicil void. And if nothing
was said at that time in relation to the residuary clause, and
Yardley wrote it of his own motion into the codicil, which was
afterwards brought fully and clearly to the knowledge of
Neill, and being possessed of a mind not then weakened, he
accepted what had been written for him, was satisfied with it,
approved and adopted it as his own, he had a perfect right to
do so, and if his mind was unimpaired, the law implies that he
understood the nature and effect of that which he was doing.

On the other hand, if the evidence satisfies you that testa-
tor's mind was weakened, that he had gone down both physi-
cally and mentally under the afflictions which fell upon him,
or, as the Supreme Court say, if this inquiry leads you to the
belief that mentally and physically he was not the John L.
Neill as when he wrote the original will of 1874, then you are
to say whether all that the law in such a case requires has been
made to appear. As I have previously said, there was no at-
tempt to explain the contents of the codicil. Nothing was
said of the value of the estate, or what the residuary portion
of it would probably amount to, or the amount of the legacies
which were given by the will of 1874, or to what extent they
had been cut down by the codicil of 1876. Is there any other
evidence in the cause that shows clearly that though his mind
had weakened, his memory and understanding was sufficiently
strong and clear to have enabled him to understand the nature
of his testamentary dispositions, and that he did in fact fully
and beyond question understand them? To doubt in a case
of this character, where the confidential adviser, being a stran-
ger, writes himself as entitled to take the bulk of this large
estate, in a codicil prepared, and its execution supervised, by
himself, would warrant you in finding against the validity of
the instrument. The law is, that in such a case it can be es-
tablished only on the most clear and satisfactory proof; if it
is wanting in this respect, it ought not to be allowed to stand.
More especially is this so, if you are not satisfied that the tes-

· tator understood how much of his estate would pass to Yardley, by the words, " the residue of my estate." It is necessary that it should be shown that the testator comprehended this clause of the codicil in its full significance understanding the amount, or about the amount, he was giving to the residuary legatee. If, therefore, the evidence satisfies you that Neill's mind was impaired on the 2d of December, 1876, and it does not clearly and satisfactorily appear that he understood how much of his property he was giving to Yardley by the residuary clause, such a conclusion would justify you in finding in favor of the defendants on the first and third of the issues on which you will be required to pass, even though you should find in favor of the plaintiffs on the second of the issues, which covers the question of testamentary capacity, which may exist though the mind be weakened and impaired.

And now, gentlemen, I do not intend to review at length the evidence, which has been commented on with so much fullness and ability by the counsel in the cause. If you are not now advised of all that can be said on each side of this controversy, so far as the evidence sheds or tends to shed light upon it, I do not think a further review of it by me could aid you in your deliberations. A brief reference to the testimony by way of classification, with some passing remarks as to certain portions of it, is all that I shall attempt to do.

The witnesses who are the most material in support of the contention that this is a true and valid instrument, are Doctor Drysdale, John S. Yardley, McPherson, and Keeney. In the order in which they are named, they may be regarded as claiming the consideration of the jury.

The testimony of Doctor Drysdale is entitled to greater consideration than that of either of the other witnesses produced in support of the will. His professional training and experience counts much in his favor. He is a gentleman of intelligence and integrity. In the discussion of the evidence, no question was raised, or doubt suggested, as to the good faith and honesty which characterized all that was said by him. The correctness of his recollection and the soundness of his opinions are, however, fair subjects for the consideration of the jury, when his testimony is weighed in connection with the other evidence in the cause.

But that which entitles what he has said to special attention and consideration is, that he was the physician of John L. Neill from the 4th of November, 1876, when testator was first paralyzed, until he left for Europe in May following, visiting him once and often twice every day. He had been the family physician of the testator for several years, was well acquainted with him, and was attending Mrs. Neill when the first stroke

[Yardley v. Cuthbertson.]

of paralysis fell on her husband. The law attaches great importance to the testimony of one who stands in the relation of physician to a testator whose mental and physical condition becomes the subject of judicial inquiry, and for very good and manifest reasons. He is regarded as peculiarly qualified to understand the condition of his patient; he ought better, perhaps, than any one else be able to form a correct judgment of his bodily infirmity, and also in what manner such infirmity may have affected the mental faculties of his patient, if they have been affected at all. The relation between body and mind ought to be the subject of observation and consideration where there is reason to believe that one is injuriously affecting the other.

Dr. Drysdale says, that the mental condition of John L. Neill did receive careful and constant consideration from him; knowing the insidious character of his disease he kept careful watch over him, with the purpose of ascertaining what progress the disease was making, as such progress might be evidenced by a change for the worse of the mental faculties. He says that such change did not come over the testator until aphasia set in, about the middle of February; says that before that time there was no breaking down. Referring to the 2d of December, he says, his mind was as clear and vigorous as ever it was; saw nothing to indicate that his mind was breaking down. From his observation of Mr. Neill's condition, and from conversations held with him, he says: "I believe his mind was perfectly sound and unaffected at that time"—when the codicil was executed. You will recall what the doctor said in relation to conversations held with the testator in regard to his stocks, about William Cuthbertson and the alteration of his will, all of them after the 4th of November, and up to and perhaps after the middle of February. That he learned to write his name with his left hand. The further particulars of what was said by the witness, tending to establish mental soundness, I must refer to your own recollection.

As against this conclusion, it has been shown by the testimony of the doctor that he had two strokes of paralysis, if not three—inclines to the opinion that he had but two, won't be certain, before the 2d of December. These attacks produced softening of the brain, which, he said, as a rule, is an incurable malady, and such it proved to be in the case of the testator. Gave Miss Lambert warning a day or two before the 2d of December that Neill was in a critical or dangerous condition. This he says for greater caution only. Speech thickened after second attack. Leg somewhat paralyzed when codicil was executed.

I, of course, do not give more than a very brief abstract of

the testimony of this witness, and must ask you to recall such portions of it as I have omitted, if it is deemed by you to be important.

I have stated that John S. Yardley may be regarded as next in importance to that of Dr. Drysdale. His testimony has relation, like that of the doctor, to the precise time when the codicil was prepared and signed. Its special significance is, that it has an important bearing not only on the fact of execution, and on the condition of the testator's mind on the first and second days of December; but its greatest importance may be found to consist in its bearing upon the question whether the testator understood at the time the full effect of what he was doing? Yardley says that instructions were given to him by the testator to make all the reductions which are mentioned in the codicil. Nothing that I recall was said in relation to the value of the estate, except what may be inferred as to a portion of it, as evidenced by Neill's reply to Yardley's question, "Will your personal estate hold out to pay the legacies?" and the answer, "I think it will." Upon the question of the condition of Neill's mind, the answer of Neill may have an important bearing in your judgment, or it may not, according to the weight which you shall give to it in connection with the other portions of the testimony. I shall enter upon no extended analysis of Yardley's testimony. It will not be difficult to recall the principal features of it. That he was sent for, and that he went to 1425 Arch street, and saw the testator, on the evening of the 1st of December, are undisputed facts in this cause. His account of what took place at that interview, if believed, is most important in support of the case of the plaintiffs. It stands, however, contradicted in nearly all of its most material statements. Either Miss Lambert or John S. Yardley have sworn to much that one or the other must have known is untrue. His testimony should be carefully scanned. If it is believed, it ought to be accepted and given its proper consideration in the cause. If it is disbelieved, it should be cast out, and allowed to have no weight with you. Motives of the most powerful character press on a witness occupying a relation to a cause like that now occupied by John S. Yardley. Character, reputation, and fortune, for him or for his heirs, are involved in this issue. These are considerations which too often induce witnesses to depart from the truth; to take upon themselves the crime of perjury; and so much regard was had by our law for the infirmity of human nature in this particular that it is only within a few years that witnesses who have a pecuniary interest in a cause have been allowed to testify in their own behalf. This barrier has been taken down, and the way to the witness stand is now almost unobstructed. Whether

this is the part of wisdom, may well be questioned. This does no more, however, than remove the disability; the credibility of the witness is left with the jury. The jury are still to say whether they believe or disbelieve that which a witness has sworn to, and testimony should always be weighed in the light of motive, which may be regarded as having operated on the mind of the person at the time at which it was given. The principle to which I have just referred, applies not only to the testimony of Yardley, but also to that of William Cuthbertson and Mrs. Murphy, both of whom have a pecuniary interest in the result of this suit. They gain or lose as this codicil is sustained or set aside; but their money interest is insignificant compared with Yardley's, and they are not influenced by the same motive to swear their side of the case to a successful result, in view of a verdict which may condemn Yardley to obloquy and reproach for the balance of his life. In considering the testimony in this cause matters of this character should not be overlooked. Not that witnesses who are interested in a cause may not, and as a rule do, swear to that which they believe to be true, and it is not that interest necessarily leads to perjury, but considerations of this character are not to be disregarded; they are to be properly weighed when credibility of witnesses is a question to be determined by a jury.

I shall refer to some of the principal points of the testimony of Yardley. Passing over that portion which relates that he was sent for on the first of December, 1876; that he went to the house of Mr. Neill at 1425 Arch street, he says that when he had come into the room where the testator was, that Mr. Neill said to him, "You know, Mary is now dead, and I want to make some alterations in my will. I want Elizabeth Lambert and Mary Ann Maloney to have what I intended they should have after the death of my wife." Then he says that Mr. Neill asked him to read his will over to him. "And he would suggest what he wanted done, what alterations he wanted made, and as I would come to the different parts of it he would say, 'That is right,' or 'Let that be.' He made or suggested no change until he came to the poor of Leith, Scotland, and he said, 'Make that four thousand.' The next was the legacy to the Saint Andrew's Society, and he said, 'Let that be.' Then when it came to the four children of Mrs. James Cuthbertson, said, 'Make that $2,500 each.' In several of the legacies he made no reduction. Then came the legacies to Mrs. Harrison, Mrs. Murphy and Mrs. Lambert, and he said, 'Make them $1,000 each.' Miss Elizabeth Lambert, who was present, said, 'Oh, they are poor—I would not put them down.' Mr. Yardley says that Mr. Neill replied, 'Yes, I will.'" Miss Lambert gives a very different account of that. She says

that he did not say anything ; that he simply waived his hand. Referring to the legacies to the different institutions, Mr. Yardley says that Mr. Neill cut all those down or reduced them as they now appear in the codicil.   Then he says, " I then said to him, ' Mr. Neill, do you think your personal property will be sufficient to pay your legacies?'   To which he said, ' Yes, I think it will.'   I said, ' wouldn't it be well, in case they are not sufficient, to authorize your executors to sell your real estate for that purpose?'   To which he said, ' Yes.'"   This, perhaps, may be important for the jury to bear in mind, in connection with the fact that was brought to their attention that the will already contained power, ample power, to sell this property.   Mr. Yardley said:   "After that, I read over the different changes and alterations which he had  directed me to make, and after reading them all over to him, I asked him whether that was ·right.   He said· it was, and  it was what he wanted."   In reply to the question by Mr. Yardley, " Mr. Neill, what disposition do you want to make of the rest and residue of your estate?"   Mr. Yardley says he said :   "For the many valuable services you have rendered me, I give it to you, my friend, John S. Yardley, and to no one else."   Then he details what took place upon the next morning, and also upon the. next evening.   He says that he read over, in the presence of Miss Lambert, this codicil, calling his attention to· the different changes and reductions that Mr. Neill had made from the original will.   Then Yardley says:   "After I had finished, I said, ' Mr. Neill, is that all right?'   He answered it was, ' and it is what I want.'   I asked him if he could write his name, and he answered ' that he could not.'"   In the evening, the 2d of December, he called with the codicil written, and there were present in the room Dr. Drysdale, Mr. McPherson and Mr. Keeney, who.were the witnesses to the codicil, also Miss Lambert.   Says that he again read the codicil to Mr. Neill in the presence of Elizabeth A. Lambert and William C. McPherson, one of the witnesses, and that when he had finished Mr. Neill said, " That's right ; that's what I want."   .The will and codicil was lying in front of Mr. Neill on the table, and he requested Dr. Drysdale to sign his name for him to this codicil.   Dr. Drysdale took a pen and wrote, " John L. Neill, his mark."   Mr. Neill took the pen in his left hand and made his cross mark.   I told Mr. Neill to place his finger on the seal, and I said, " You sign, seal, publish and declare that as for a codicil to your last will and testament," and he said, " I do."   Then he gives a description of what took place at that time.   He said Miss Lambert, Dr. Drysdale, Mr. Keeney and Mr. McPherson were present.   He says, in answer to the question whether anything was said by himself or to

[Yardley *v.* Cuthbertson.]

Miss Lambert as to the value of Mr. Neill's estate, that when he went in the morning with the draft he did not say what the value of the property was to Miss Lambert or Mr. Neill.

Now, referring to the testimony of Mr. McPherson and Mr. Keeney. Mr. McPherson says that there was conversation between Mr. Neill, himself, Miss Lambert and Mr. Yardley; in conversation he was as bright as he ever was; made his mark himself; did not know that he used a word in answer to the question whether that was right. "Neill made remarks; so did Miss Lambert." Keeney says that he did not know that Neill took part in the conversation. After the execution of the paper Mr. Neill did converse, after Mr. Yardley had left. Did not look broken down.

Perhaps the next witness to which the attention of the jury is to be called, is Mr. Sellers, who says that he had a visit from Mr. Neill between the first and the twelfth of December, fixing it finally upon the eleventh of December, 1876. He gave you a full statement of the reason for Mr. Neill coming to see him, he being counsel for him in the conduct of a suit. When first upon the stand, he said that the visit was between the first and the twelfth of December; the second time he was called to the stand he fixed it clearly as having taken place upon the eleventh of December. He told you the situation of his office; he said that Mr. Neill called with certain plans of part of his property that were to be used in the suit; that Mr. Neill had some understanding in regard to his being notified in regard to the suit coming up in December; he called Mr. Sellers' attention to it, and made some inquiry in regard to that suit. Mr. Sellers said that he replied to him that he would examine the list of the Supreme Court and let him know. Mr. Neill said, "I want to be there when the case is argued." Mr. Sellers said that Mr. Neill, after he had got through, laid the plans upon the table, bade him good bye, and said that if he should not see him again, he wished him a Merry Christmas. Mr. Sellers is very positive now that this was on the eleventh of December, and that at this time Mr. Neill was not only able to go to his office, to walk in of himself into that room, but to hold a conversation with him, which so far as Mr. Sellers was able to judge, exhibited the mind of Mr. Neill to be just as clear as it had ever been. He observed no difference in him. He did not even observe that he was affected in his ability to walk, that his leg was in any degree affected. And in confirmation of his recollection, his opinion upon this point, he said that he went over to the Supreme Court to ascertain in regard to that list. It is unnecessary for me to repeat in detail what he said in regard to his interview with the clerk, and that he found that the case was not upon the list, and then

the explanation which he gives of the appearance of this same case upon the list of Court No. 2 for January; that it was argued in December and decided in January. From that the defendants argue to you that Mr. Sellers must have been mistaken. No person who knows Mr. Sellers would cast the slightest suspicion on his integrity; that he believes firmly what he says took place. But the counsel for the defendants argue that he was actually mistaken. The inference that you are asked to draw is that Mr. Sellers is wholly mistaken as to time; that this visit must have been much earlier; that if the case was only argued in December, and disposed of January following, that there could have been no appeal to the Supreme Court in December. Mr. Sellers' explanation of that is that the case had been argued in June; that it was set down upon the list just where it is found now, for the purpose of having the proper entries made. That is his explanation of it. Whether he is right or wrong, of course is a question which you will determine, if you can, under this evidence.

There is also the testimony of Mr. Flanders. Mr. Flanders had also been counsel for Mr. Neill, and he said that two or three weeks after the death of Mrs. Neill, having been informed by Captain Young that Mrs. Neill was dead, he went to the house of Mr. Neill and had an interview with him. Now, if Mr. Flanders is right in regard to the time which he fixes, it would seem to be almost impossible to reconcile his testimony with that of Mr. Sellers. His interview with Mr. Neill could not have been far from the 11th of December, so that the testimony of these two gentlemen—both gentlemen of great intelligence—is before you upon what seems to be, according to the view taken, a mistake by one or the other. Now, it is contended that Mr. Flanders must have been mistaken as to time, because Mr. Flanders says that at that time Mr. Neill could not talk to him at all; that Mr. Neill was unable to converse; and if Mr. Flanders is right in his recollection, it would be very difficult to reconcile a great deal of the other testimony in the case with that statement of Mr. Flanders. Mr. Flanders says that he considered Mr. Neill at that time to have been perfectly clear in his mind; he looked intelligent; he talked to him about his case; understood, as Mr. Flanders supposed, everything that he said to him. Yet the fact remains that just at that time, when, according to Mr. Sellers' testimony, Mr. Neill was able to walk down to the office, hold a conversation with him,—just about the same time as Mr. Flanders says that when he called to see Mr. Neill at his house on Arch street, he could not talk to him at all. The testimony of these two gentlemen stands in this way. It only shows the imperfection of human memory,—how liable we are all to

be mistaken. Still, the testimony is to be taken and considered by you. In regard to the condition of Mr. Neill at this time, it is important.

Now, quite a number of witnesses have been called. Mr. Miller, Mr. Taylor, Mr. Brown, Mr. Caldwell and Mr. Gillingham, all called for the purpose of showing the condition of Mr. Neill long after the 2d of December, 1876, running on to January, March and April, 1877, in which these gentlemen testify that Mr. Neill called at the offices of the different companies in which they were engaged, in which Mr. Neill owned stock, and they testify that he called as late as April, having conversations in January certainly with Mr. Taylor and perhaps with Mr. Brown, and, I think, with Mr. Caldwell, having conversations with several of these gentlemen, and transacting business with all of them. His latter calls being according to the recollection of some of the witnesses, in the company of another person; their recollection being that he was supported by another person, who probably was Mr. Cuthbertson. Several of these witnesses are not able to say that when he called in January at their offices, when dividends were paid to him, when receipts were signed, when checks were given to him, there was any person with him. You recollect what Mr. Taylor said, which no doubt is entitled to entire credit at the hands of the jury, about the conversation he had with him about the mistake which Mr. Taylor made in making an overpayment to him, about Mr. Neill coming down the next day and paying him the difference.

I wish I could have written all I have to say upon this subject, but from other work I was unable to do so, therefore I must fill up what it is necessary to say about the evidence, not being able to read it to you.

But these witnesses are all called for the purpose of showing, not only the physical ability of Mr. Neill to go about to these offices, but also to show the clearness of his mind, and also for the purpose of showing, as far as the testimony of these witnesses referred to conversations had with him, that he was intelligent, that they understood him, that while there was an affection of the speech according to some of the witnesses, there was nothing that prevented them understanding him at his early calls, that is in January. This is important to be taken into account by the jury in passing upon the question of the physical condition of the testator, because it refers to points of time long after the 2d of December; because evidence as to the physical and mental condition of a party whose mental capacity is the subject of controversy is important; because it may shed light forward or backward upon the inquiry which you have to settle, namely, what was the condition of John L. Neill on the 2d of December, 1876?

Now, I have said to you that a lunatic may make a good will, if it be shown that this was done when he had a lucid interval, or a man whose mind may be weakened and impaired, if it be shown in the course of the investigation that that man's mind varied. These are circumstances to be taken into account in endeavoring to seek for light upon this question, that is, upon the question as to what was the condition of the testator's mind at the time when this codicil was executed. Mr. Pidgeon knew very little about it.

Then there is the testimony of Horace Yardley, to which I think it scarcely necessary to make any reference. I think that his conduct upon the stand was such as to meet the approval of every person who witnessed it. He has a large interest in this controversy, and I am sure he deported himself in such a way as to commend himself to the favorable impression of every one who heard him. His testimony confirms his father's statement, that his father was sent for on the evening of the first of December, 1876; it contradicts William Cuthbertson's or shows that William Cuthbertson did say before he left this country that he believed that Mr. Neill's mind was clear. He did not see Mr. Neill upon the 1st or 2d of December, or at any time very close the 2d of December. He was at the office of his father after he was afflicted with paralysis, some time in the summer of 1877, but that perhaps is the only time, so far as his testimony goes, on which he saw Mr. Neill after he was stricken down with paralysis, and perhaps at no other time before his death did he see him.

Now upon the part of the defendants perhaps the most material witness is Miss Elizabeth A. Lambert. Now, Miss Lambert says as I have already stated in my charge, that this interview on the 1st of December 1876, was brought about by her suggestion to Mr. Neill of doubt of the provisions of the will in regard to herself. She said that Mr. Neill and herself were sitting together on the first of December, after the death of Mrs. Neill, and that she said to Mr. Neill, "What will become of me if anything happens to you?" and he replied, "You are all right, you are provided for;" and then she said that he told her to get the will and read it, and that she then said to him, "Will this hold good for me?" And that Mr. Neill said "send for Mr. Yardley," and that Mr. Yardley was sent for. Her testimony is that when Mr. Yardley came in she asked this question: "Mr. Yardley, will you see if that holds good for me." To that Mr. Yardley made no reply; he sat down by the side of the table, near to which Mr. Neill was sitting; he took pen and paper and commenced to read the will, and as he read it over, suggested all those various alterations which are contained in the codicil. According to her statement the

first question which Mr. Yardley asked was in regard to the Cuthbertsons; he said, "Who are these, are they relatives?" To that, the reply was, "No." He then said, "Twenty-five thousand dollars, a hundred thousand dollars to one family! Make it twenty-five hundred." And that he sat down and wrote that himself, or wrote something upon the paper, and that Mr. Neill did not say one word about it. Then she says that when it came to the three ladies, Mrs. Murphy, Mrs. Lambert, and Miss Harrison, that he said, "Make them one thousand dollars each," and that Mr. Neill said nothing to that. She says Mr. Yardley went on reading and writing until he got through, and that Mr. Neill said not one word during the whole of this interview, in regard to these suggested reductions. She says that when the will was read over by Mr. Yardley to Mr. Neill, Mr. Neill said that Miss Maloney's name was mentioned twice, and that something was said about the poor of Leith. Mr. Yardley's account is that Mr. Neill said with reference to the legacy to the poor of Leith, that Mr. Neill said make it four thousand, and Mr. Yardley said, "I think seven thousand is as little as you can leave to your native place." Miss Lambert's testimony agrees with that of Mr. Yardley with reference to the remark which she made as to. the legacies to the three ladies, "Oh, they are poor." But as to all the material reductions, she says that they were suggested by Yardley, and that Mr. Neill did not suggest or direct one of them. Now she says that Mr. Neill said, "I give John S. Yardley ten thousand dollars," and that Mr. Yardley said, "Thank you;" that Mr. Yardley then said, "There will be a residue, will that go to your heirs and assigns?" and that Mr. Neill said nothing.

Such, in substance, is her testimony as to the transactions of that evening. Then you recollect her account of the occurrences of the following morning and evening. She said Mr. Yardley read the codicil in the morning, and after he got through he went away. Mr. Yardley's testimony is that when he read the codicil to Mr. Neill that morning, he said, "Is that right?" And Mr. Neill replied, "That is just what I want." Miss Lambert says that nothing was said by Mr. Neill about it at all. Then she brings the parties together again when the codicil was executed. She says she did not hear Mr. Neill say one word at that time. She did not hear him assent to the execution of the codicil, nor did she see him assent to it. Such is the substance of her testimony in regard to the transactions of the first and second of December. You will see how very important this testimony of Miss Lambert is, because if her statement is true, Mr. Yardley's cannot be true, and if Mr. Yardley's is true hers cannot be true; that Mr.

[Yardley *v.* Cuthbertson.]

Neill being weak and sick and infirm submitted to what Mr. Yardley chose to do, and that not he, but Mr. Yardley, suggested the various alterations. Now, she also says she got this will, under the direction of Mr. Neill, upon Monday, the fourth day of December, and that she read it over to him, read it over slowly and distinctly. The codicil was left at the house of Mr. Neill, was taken possession of by Miss Lambert, was put away by her, and was got by her again on the morning of the fourth of December, and that too by the direction of Mr. Neill; that he told her to get the will and read it over to him, and that she did so, read it distinctly, to which he made no reply, made no comment. I think she afterwards said that he may have said, "Put it away," when she got through. In the first portion of her testimony she said that he made no reply at all. Now there is one portion of this testimony of Miss Lambert to which I had better refer now, and that is the apparent contradiction or rather the direct contradiction about what she said at the interview in Mr. Paul's office. She went to meet Mr. Paul and Mr. Willson at the office of Mr. Paul. Mr. Paul's testimony is that at that time not only Mr. Neill's mind was perfectly clear, but Mr. Paul has no hesitation in saying that such was the statement of Miss Lambert, made to him in the presence of Mr. Willson and in the presence of Mr. Yardley, upon the occasion of this visit. Miss Lambert said that she could not and did not say that. That is a very important part of this case, when you come to consider the credit which you will give to the testimony of Miss Lambert as to what was Mr. Neill's condition; whether she said what Mr. Paul says she did say at his office. Mr. Paul gave you the reason why this fact had impressed itself upon his mind. He was asked the question whether he was not then attending to a full business, with the view of showing that it would be difficult for a lawyer so engaged to recollect small particular occurrences, and he says that he thought that that would be very important testimony in the event of a controversy with regard to the codicil. In regard to that portion of her testimony which relates to the condition of Mr. Neill, referring to the attack having taken place on the 4th of November, she described what Mr. Neill said; that his cane had fallen out of his hand, and that he could not get money out of his purse. She says that she thinks that upon the second day after that he had the second attack, and that the third attack was several days before the death of Mrs. Neill. The testimony of Miss Lambert and Miss Maloney is in conflict with that of Dr. Drysdale on this point.

But as to this the Doctor's testimony is not entirely consistent. The Doctor says that he won't be certain that he had

not had three attacks before the codicil was executed; he inclines to the belief that he had but two; he confesses that he is a little uncertain on that point, but inclines to the opinion that he had but two. But Miss Lambert and Miss Maloney both say that he had three attacks before the codicil was executed; the third attack Miss Lambert said was in the night, that there were eleven days between the second and the third, and that for some time after that Mr. Neill appeared dead to everything; that his speech was affected after the second attack. Then she gives as an illustration of what she says of his condition, that he was very much broken down, dead to everything; that when the newspapers had been read to him that he would sit and listen to what was read, and she would ask if she would read it over again, and that he would assent by nodding and that she would read it over again. She would give him the newspaper himself to read, and it would fall from his hands; that he did not leave the house after he returned from the dentist's, on the 4th of November, until the 14th of December; that his wants had to be attended to; that he had to be fed with a spoon, and that he could not help himself at all, and that he had to be dressed; that he could hold no conversation when the codicil was executed; that he not only did not converse, but that he could not converse. Dr. Drysdale said that upon that morning Mr. Neill had asked him to come to the house and witness the execution of the codicil; Miss Lambert says that upon that day he could not converse at all; that he never went down stairs after the 6th of November; that he was broken down with sorrow from the 4th of November; that when the papers were read to him he did not take any notice; that he was dead to the fact that the codicil had been made. The testimony is as strong as that; he had lost the consciousness or the recollection that the codicil had been executed.

I have already referred to what she says in regard to Mr. Yardley's coming to the house when the memoranda for the preparation for the codicil were made, and that nothing was said at all about giving him the residue, and then she says, when asked the question, "Why, if you heard this codicil read on the evening of the 1st of December, and on the morning and evening of the 2d of December, and if you read it over to Mr. Neill upon the 6th of December, how is it that you did not comprehend that Mr. Yardley was to take the balance of the estate?" And she gives what is perhaps, if a truthful explanation, the only reasonable explanation of it; that she was absorbed in regard to her own interests; and that certainly, according to her account, was the occasion for bringing Mr. Yardley into that house on the evening of the 1st of Decem-

ber.   The fact still remains, however, that Miss Lambert did hear this draft read ; that she did hear what purported to be the codicil read before it was executed on the evening of the 2d of December, and that she did read it herself over to Mr. Neill on the 4th of December.   All these facts are before the jury, and yet she says that she did not comprehend that Mr. Yardley was to take the residuary portion of the estate.   This is the reason, she explains, why she did not object to the execution of this paper.

Now, there is a portion of this testimony of Miss Lambert which is very important for the jury to consider ; that is the interview which is said to have taken place between Mr. Yardley and Miss Lambert in the parlor of 1425 Arch street, in the summer of 1878, after this controversy had begun.   Mr. Yardley went there for the purpose, as he says, of telling them about the completion of the cemetery lot.   Mr. Yardley himself says that Miss Lambert said : " You did the cutting down."   They disputed over the fact.   She says that Mr. Yardley got very angry, went up and down the room, and became very excited.   But she says that it finally ended in Mr. Yardley's going away and saying, that he would see counsel and write her a note, letting her know ; that he did not write her, and that he came back himself.   She says that she asked him, with reference to her testimony being required :   " Don't you think they could do without me ? "   And he said : " No," because if one side did not call her, the other would.   And then, according to Miss Lambert, he said to her :   " I'll tell you what you can say, say you were so sick, and that you were so much troubled and worried that you don't recollect anything about it."   In that she is contradicted by Mr. Yardley.   But if that is true it would go very far—it ought to go very far—in inducing the jury to look upon the whole conduct of Mr. Yardley in connection with this case with very great scrutiny and very grave suspicion. A man who would suggest, or attempt, or ask another person to commit the crime of perjury for the purpose of putting property into his own pocket, is unworthy of being credited in regard to anything that he says, or being trusted in regard to any transaction in which he is engaged, and, therefore, it is of great importance.

There is another matter to which not so much importance belongs, but which is also to be considered by you.   It was argued that he also attempted to sway the testimony of these ladies by holding out the inducement that he would favor St. Mary's Hospital, belonging to the same denomination as these ladies, because the hospital had not taken part in the controversy as to the codicil.   That, it is argued, was an appeal to their sympathy and feeling for the purpose of inducing them

to favor him, and not to take an active part against him.  But the most objectionable part of this statement is that to which I have referred, and I do not think that any one could stand in a more unfavorable attitude, if that statement is true, than John S. Yardley.  If the statement is true, let it have its proper weight in passing upon the credit which you give to the testimony of Mr. Yardley, and upon his whole connection with this transaction.  In that statement Miss Lambert is confirmed by Miss Maloney, who says that what Miss Lambert testified to was true.  These two ladies are before you; the credit which you will give to their statements is to be determined by the jury.  It is argued that they are under bias, and that they have changed their front in regard to this controversy.  On the other hand, it is contended that it was quiescence, and that Miss Lambert waked up to the consciousness of the part which Yardley had taken in regard to the procuring of the cutting down of the legacies, and that she thus broke ground with him, and from that time has taken her position upon the other side of this question.

Now, there is a portion of this testimony of Miss Lambert and Miss Maloney, to which I ought also to refer just now, and that is that part of it which relates to the declaration or statement made by Miss Lambert to Miss Maloney upon the evening of the first of December, just after Mr. Yardley left. She said she went out of the room in which she and Mr. Yardley and Mr. Neill had been, and went to the sitting-room, in which Miss Maloney was at the time and said, "What do you think of Mr. Yardley getting ten thousand dollars?" and that she said, "He might have left it to me." Miss Maloney's reply was, "Well, he could hardly have done that." But she says that a conversation did take place; Miss Lambert says so and Miss Maloney says so. That is placed before the jury. It is repeating at the time the statement she now says was made, in regard to Mr. Neill's saying to Yardley, "I give you ten thousand dollars." Now, that was given in evidence upon this principle, that where declarations are made cotemporaneously with the act, if they grow out of it or are connected with it, the law permits them to be given in evidence as part of the *res gestæ.* It would be objectionable as hearsay testimony if it were not for that, but it is Miss Lambert leaving the room and relating immediately to Miss Maloney what she now says did occur; it shows that directly after leaving the room she went out and made that statement. You may credit it or you may disbelieve it.

I don't think it is necessary for me to refer with any great detail to what Miss Maloney said. In substance she corroborates Miss Lambert as to Mr. Neill's condition. She speaks

12 Outerbridge.—28

of him as utterly broken down with sorrow at the time; of the attention given to him by Miss Lambert and Mr. Cuthbertson; that he had to be led into the room when his wife was dying. She seems to have had nothing, or at least, very little, to do with the care of Mr. Neill, but she confirms Miss Lambert's statement in regard to the necessity of care over him, in the way of cutting up his food and feeding him; and the constant care which Miss Lambert and Mr. Cuthbertson exercised over him because of his helplessness. I do not think that there is any part of the testimony of Miss Maloney that calls for special notice, except to refresh the recollection of the jury by calling their attention generally to what Miss Maloney said. It is principally corroborative of Miss Lambert's testimony as to the condition of Mr. Neill at that time.

Now, there is the testimony of one witness that the jury will no doubt refer to as bearing very markedly upon the condition of Mr. Neill, certainly about or after the time of the death of his wife. I refer to the testimony of Carson. He is in no way connected with the cause. He testifies that upon the twenty-second of November he was directed to take four hundred dollars to the house of Mr. Neill, to take a blank check which he was to get Mr. Neill to sign. I need not describe to you what he said, further than to call your general attention to his description of the appearance of Mr. Neill at that time. He said he sat in a chair, looked very much worse than he had been looking. When he went into the room Mr. Neill took no notice of him, did not attempt to speak to him. Miss Lambert spoke to Mr. Neill, said there was a young man from the bank, who had brought a note from the cashier; he did not attempt to read the note so far as Mr. Carson saw; that she leaned over Mr. Neill and said that there was a young man from the bank, and that he appeared to take no notice of it. She repeated the remark that there was a young man from the bank with a note from the cashier, and that he paid no attention to that; and then she got lower down and repeated that statement to him again, and that he made some effort to say something to Miss Lambert; that he did hear a sound, but heard not one word that he could understand. He then counted the money out before Mr. Neill, Mr. Neill took no notice of it, and then he took the check, and took the pen and put it in Mr. Neill's fingers and guided his hand, and that he himself thus made the mark to the check. Now, perhaps the answer to that is that it was just following the death of his wife, while she was yet unburied, that naturally he would be expected to be overcome with grief and sorrow. Yet the jury are to say whether that is the way in which a man whose mind was not impaired would have been affected, whether John L.

Neill's mind was as strong as ever it was, whether the death of the wife of a man of unusually vigorous mind could have produced such an effect upon him as to produce in him the effect which Mr. Carson described. Mr. Carson has no interest in the case; he is outside of the case. His act was performed as a servant of the bank, and its being performed to him was nothing, and therefore he may be regarded as telling the jury exactly what took place as he understood it, on that occasion on the 22d of November.

In regard to the testimony of Mrs. Murphy, she saw Mr. Neill only about the time of the death of his wife. She says that he was very much broken down, and very much overcome.

Now, as to the testimony of William Cuthbertson, it is not necessary to refer in any detail to that testimony. You recollect he describes, or attempts to describe, the condition of Mr. Neill after he was prostrated by paralysis upon the 4th of November. I do not mean to imply that you ought to doubt the credibility of William Cuthbertson. I only mean to say that his testimony is general, upon the general subject of the condition of Mr Neill, his inability to attend to business, what had to be done for him, and so on. What I mean to say is, that taking the whole testimony of William Cuthbertson in relation to his conduct, that it is fairly open to the criticism which has been made upon it, that his answers are evasive. For some reason, William Cuthbertson has not seen fit to join in this controversy. Whether it was because he believed that this codicil expresses the true mind of Mr. Neill or not, or whether it was out of delicacy of feeling, as he says, he did refuse to become a party to this controversy: and whilst his testimony bears to some extent against the case of the plaintiffs, perhaps the jury will not find that the tone of it is not that of exaggeration. I leave, at the same time, the amount of credit which you give to his testimony with you. He is not here to answer for himself, and there are some things about it which really commend the position of Cuthbertson to favorable explanation. Whether there is an honorable explanation of it, or whether there is one which impairs the credibility of his testimony, it is for you to say.

Alice Lawless knows very little about the case. She spoke of hearing the conversation on the occasion of the parlor interview between Mr. Yardley and Miss Lambert, and there is something about the condition of Mr. Neill about the time of the death of Mrs. Neill. But there is a good deal that can be said in the way of discrediting her statements. She did not present herself as challenging any great consideration, from the way in which she behaved and what she said when she was

[Yardley *v.* Cuthbertson.]

upon the stand. She is a little hasty, and she admitted that she said just what came into her mind, which reflects not very favorably upon the testimony of a witness.

Now, upon the part of the defendants there is another class of witnesses about which I will say something, and that is the testimony of the experts, Dr. Pepper, Dr. Jones, and Dr. Hunt. The expert testimony was criticised as not reliable, and the jury were asked to place very little dependence upon what these experts said in the way of giving an opinion upon the case as it was stated to them. It is enough to say, gentlemen, that the law recognizes that kind of testimony as proper to be presented to the consideration of the jury. And therefore it was proper to call these gentlemen and examine them, and then leave it to the jury to weigh their testimony, just as that of any other witness. Expert testimony is admitted because of the necessity in endeavoring from what experts may say, to arrive at the justice of a cause. Experts are supposed to have greater knowledge in regard to subjects which they have made the matter of special examination. Take the case of a layman seeing the progress of a disease, he can say he saw such and such manifestations, but that is about all that he can tell you. But you bring a physician, that has made medical science a study, a man at the same time of integrity,—he ought to be versed in the specialties of his own profession,— and let him talk to you about that particular case, and his testimony, if it is simply put upon the ground of that of an expert, would be entitled to much greater weight than that of a man who could not be supposed to have great knowledge. These gentlemen are called for the purpose of expressing an opinion to you upon the condition of the mind of the testator upon the 2d of December, 1876. Hypothetical questions were propounded to each of these gentlemen, and they were asked to say as medical experts, as those who have given diseases of the mind special study, and being in constant contact with persons who were mentally afflicted, and who were familiar with the means employed for the purpose of relieving these afflictions if they can be relieved; they were asked upon a statement, as testified to, of facts upon the statements made by certain of the defendants' witnesses, to say what their opinion of the mental condition of John L. Neill must have been, supposing these statements to be true. Now, of course, these witnesses stand before you to be judged just the same as other witnesses are, by their intelligence, integrity, and fairness of their testimony, and in all cases those rules have to be applied to these witnesses just as to all others. The jury having heard what has been said by them as gentlemen of integrity and standing, of position and of experience, and also the

[Yardley v. Cuthbertson.]

criticisms which were presented to the consideration of the jury upon their testimony, you ought to say just what weight you will give to it. These gentlemen are all well known as men of eminence in their profession. Dr. Pepper stands very high as a physician, and he says that he has made this subject a matter of special consideration. Dr. Jones has been for many years connected with the asylum known as "Kirkbride's," and has, therefore, great experience in dealing with people mentally afflicted. He was placed upon the stand for the purpose of giving you his opinion of the facts, (and if you believe them as stated to him,) what conclusions were to be deduced from these facts:—Then there is Dr. Hunt. In regard to their testimony, Dr. Pepper said: Supposing these facts to be true, it was a case of rapidly progressing organic disease of the brain that was incurable. Dr. Jones said that, taking these facts as true, Mr. Neill was in a state of pronounced dementia when the codicil was made. Dr. Hunt said that his mind was impaired. Now, when the question was put to these witnesses whether a physician who had attended the patient throughout the course of his disease had not a better opportunity of arriving at a correct conclusion than an expert who simply had a certain state of facts presented to him, they said yes. But, after all, you must decide as between their judgment and that of Dr. Drysdale, of whom there was no pretence that his specialty was diseases of the mind. The whole value of the statements of these witnesses is that they are called as experts who have made this matter of diseases of the mind the subject of special study and consideration, and therefore, they are presumed to speak with special effect.

Now, gentlemen, take this case in charge, and you are entitled, in looking at the question, to take both the will and the codicil, to examine them, to look at the two papers, placing them side by side, and consider them separately and together, because the question is as to whether the will shall stand alone, or whether that will, to a certain extent, shall go down, and the codicil be substituted as far as it introduces alterations in the will. Therefore, it is proper that you should have before you these two papers, examine them together, look at the circumstances under which the one was executed, and then the circumstances under which the other was executed, and then by the testimony which bears upon the question as to whether the modifications or changes which this codicil introduces into the distribution of the estate of John L. Neill, say whether it was the true act of John L. Neill, or whether it was not. You are entitled to take these two papers with you and examine them in the light of all this evi-

dence, and see whether they help you in arriving at a correct conclusion.

There is still very much more that it might be proper for me to say, but which time will not permit me to say.

Here is the case of a man, who, though advanced in years, was in vigorous health, stricken down suddenly. Going out of his house one morning the warning was given to him in such a way that he could not turn away from it. The strong man, who fought his battle of life well and successfully, at last received the warning, that the final summons was, perhaps, not very far off. From that time he never recovered; he perhaps got better or worse, physically or mentally, as the system would go up or down, governed by his improved or impaired physical and bodily condition. But the fact remains that he never recovered from that time, and that the blow which fell upon him was an incurable malady, is evident from the testimony in this cause. I recollect a will case which was tried before me many years ago, which took about as long as this case. There was an old man brought upon the stand who had been the attendant upon the testator, just as Cuthbertson, perhaps was to Mr. Neill when he became helpless. This old man had cared for the testator, and he described at very great length his condition. He was called against the will. Mr. Henry J. Williams was one of the counsel for the plaintiffs, and tried to get from the attendant how long the testator had been in that condition.

He had described what he had to do for him, how helpless he was, that he had to be cared for, put to bed, washed, dressed, fed, and so on.

Mr. Williams pressed for his answer to his question, how long this had lasted, and finally the witness became somewhat irritated and said, " Well, sir, I can't say how long it was, but it was all the time he was on his road to death."

This seems to have been very much the case with Mr. Neill; he never became a sound man after that first attack on the 4th of November, and from that time on he was on his road to death. But that condition, whatever it may have been in its various moods, is only important as it sheds light or otherwise upon the question of the mental condition of John L. Neill upon the 2d of December, 1876. Now, whatever you may do, I am sure, judging from your conduct during all this cause, your fidelity in your attendance, your punctuality that was very remarkable, the attention which you have given to the case, and no jury could have given closer attention to the testimony and the consideration of it by counsel, whatever you shall do, I, at least, shall feel satisfied will be done as the result of an honest effort to reach the truth in this case, and that your endeavor will be to

find such a verdict as you think the justice and the law of the case calls for.

Verdict in favor of defendants on the first and second of the issues, and in favor of the plaintiffs on the third of the issues, and judgment thereon. The plaintiff took this writ of error and filed the following assignments of error (other than the first, given supra, p. 400,)viz.:

*Second.*—That the learned judge, before whom the case was tried, erred in overruling an objection on the part of the plaintiffs to the following question, which was addressed to Dr. William Pepper, a witness called by the defendants, as appears from the following extract from the bill of exceptions, viz. :—

" Q. Assume that you were called upon the 2d of December, 1876, to test Mr. John L. Neill's mental capacity prior to a proposed change in a former will, and that the whole of the plaintiffs' testimony as presented in evidence, in this issue, was produced before you. I wish to know your opinion of the sufficiency of that evidence to your mind in determining the question of his mental capacity or not? . . . . .

THE COURT: . . . . . I think the witness may answer the question.

" (Objection by plaintiffs overruled. Exception.)

" A. It would seem to me insufficient.

*Third.*—That the said learned judge erred in overruling an objection on the part of the plaintiffs to the following question which was addressed to Dr. William Pepper, a witness called by the defendants, as appears from the following extract from the bill of exceptions, viz. :—

" Q. Now, sir, assuming that the testimony of the defendants in this issue, that is of the contestants of the codicil, to be true, and taking that testimony as a whole, will you please state what that testimony indicates as to John L. Neill's mental capacity on the 2d of December, 1876?

" (Question objected to by plaintiffs.)

" . . . . . The court admits the question.

" (Exception taken by plaintiffs' counsel.)

" A. I take as the basis of my answer the testimony of Miss Lambert, Miss Maloney, Miss Lawless, William Cuthbertson, and assuming that their testimony is true, and that their opportunities for observing John L. Neill were such as therein stated, I should have no doubt as to the fact that his mental powers were very much impaired, and that he was incapable of transacting business requiring memory or judgment, and that he certainly was devoid of testamentary capacity."

*Fourth.*—That the said learned judge erred in overruling an objection on the part of the plaintiffs to the following

[Yardley *v.* Cuthbertson.]

question which was addressed to Dr. S. Preston Jones, a witness called by the defendants, as appears from the following extract from the bill of exceptions, viz.:—

" Q. Now, sir, assume the defendants' testimony to be true, and taking it as a whole, what does it show to you as a medical expert as to John L. Neill's mental condition on the second of December, 1876 ?

" (Objected to by plaintiffs. Objection overruled. Exception.)

" A. That Mr. Neill's mind was very much impaired; that it was in a state of pronounced *dementia* at that time."

*Fifth.*—That the said learned Judge erred in refusing to allow the plaintiffs in rebuttal to ask a witness, Caleb R. Keeney, the question which is contained in the following extract from the bill of exceptions :—" Question. It has been testified, Mr. Keeney, that from before the 2d of December, when the codicil was executed, until a long time after that date, Mr. Neill was only able to speak in a manner resembling what I now give to you as an illustration. Do—you—say—so ? What is your recollection as to that point ?

" Objected to by Mr. Biddle. Refers the court to question and answer on page 74 of the testimony.

" The court rejects the offer. Exception by plaintiffs."

*Sixth.*—That the said learned judge erred in refusing to allow the plaintiffs in rebuttal to ask a witness, William C. McPherson, the question which is contained in the following extract from the bill of exceptions :—

" Question. In your testimony in chief you said that Mr. Neill spoke at the time when you saw him, when the codicil was executed, as I remember your testimony, somewhat slower than usual. It has been testified that his manner of speech at that time was substantially this: Do—you—say—so ? I desire to ask you whether that was his manner of speech at that time or anything like it ?

Objected to. Objection sustained. Exception by plaintiffs."

*Seventh.*—That the said learned judge erred in refusing to allow the plaintiffs in rebuttal to ask a witness, Dr. Thomas M. Drysdale, the question which is contained in the following extract from the bill of exceptions :—

" Question. When you were upon the stand before, you stated that you were not able to fix the time of the second stroke of paralysis accurately, as to whether it was two or three weeks from the first stroke. Testimony has been given for the defendants to the effect that the second stroke occurred two days after the first. Are you able to say from recollection whether or not that is so ?

[Yardley v. Cuthbertson.]

*Mr. Biddle:*—We object to that, sir, on the ground the Doctor has already testified . . . . . on this very subject.

Question overruled.    Exception by plaintiffs."

*Eighth.*—That the said learned judge erred in refusing to allow the plaintiffs in rebuttal to ask a witness, Dr. Thomas M. Drysdale, the question which is contained in the following extract from the bill of exceptions:—

" Question. Doctor, it has been testified substantially, if I remember the testimony, not having it before me, that thickness of speech after an attack of paralysis, affecting the hand, the arm, and possibly the leg, being something such as a drunken man would utter, indicated a disturbance of the posterior portions of the brain.   I would like to know what you have to say in regard to this particular thickness of speech which Mr. Neill had, as to whether it did or did not indicate any such disturbance.

THE COURT:—I think the question must be overruled for the same reason.

Exception by plaintiffs."

*Ninth.*—That the said learned judge erred in refusing to allow the plaintiffs in rebuttal to ask a witness, Dr. Thomas M. Drysdale, the question which is contained in the following extract from the bill of exceptions:—

" Question. Were you ever informed by any member of the family while he was sick, that he was fed?

Objected to by defendants.   Objection sustained.   Exception by plaintiffs."

*Tenth.*—That the said learned judge erred in the answer which he made to the second point presented to him on behalf of the plaintiffs.

The said point was as follows, viz:—" That under the first count, unless the jury shall find either that the testator was not possessed of testamentary capacity at the time when the codicil was executed, or that the codicil was procured by undue influence, fraud, imposition, or duress, they must find a verdict for the plaintiffs in favor of the validity of the codicil."

The answer of the court thereto was as follows, viz:—

" This is answered in the negative as it stands.   The jury may find that the testator was possessed of testamentary capacity at the time that the codicil was excuted, and that the codicil was not procured by undue influence, fraud, imposition, or duress.   If they also find that the testator's mind had become impaired, and if it does not appear that the testator was informed, at the time of the making and execution of the codicil, what was the value of his estate nor how much of it the residuary legatee would take under the residuary clause

of the codicil, and if it does not appear that he otherwise understood both these points, they would be justified in finding in favor of the defendants on the first count.

*Eleventh.*—That the said learned judge erred in the qualification contained in the answer which he made to the fourth point presented to him on behalf of the plaintiffs.

The said point was as follows, viz.: "If the jury believe from the evidence that Mr. Neill was of sound mind when the codicil was made, and himself suggested or directed the alterations in his will which are contained in the codicil and the residuary clause contained therein, no presumption arises against the validity of the codicil because of the relation in which Mr. Yardly stood to Mr. Neill, in the drawing and execution of the codicil."

The answer of the court thereto was as follows, viz.: "This point is affirmed, with this qualification: that it is always ground for suspicion where one holding confidential relations to a testator prepares for and directs the execution of a will under which he takes a considerable interest, and that the obligation rests on such confidential agent to show, by clear and satisfactory proof, that the testator fully understood the testamentary disposition of his property as it may be expressed in the will or codicil."

*Twelfth.*—That the said learned judge erred in the qualification contained in the answer which he made to the fifth point presented to him on behalf of the plaintiffs.

The said point was as follows, viz.: "That if the jury believed from the evidence that Mr. Neill was of a sound and unimpaired mind at the time when the codicil was executed, and knew what was contained in the same, their verdict upon all the questions submitted to them must be in favor of the validity of the codicil."

The answer of the court thereto was as follows, viz.: "I answer this in the affirmative, with this qualification: it must be clearly and satisfactorily proved in the opinion of the jury, that the testator not only knew what was contained in the codicil, but that he freely executed the same without coercion or constraint from any one."

*Thirteenth.*—That the said learned judge erred in the answer which he made to the eighth point presented to him on behalf of the plaintiffs.

The said point was as follows, viz.: "If the jury believe from the evidence that, after the codicil was executed, both the will and the codicil were read to Mr. Neill by his direction, that he was then in a condition of mind fully to comprehend the meaning and effect of the codicil, and that after hearing the will and codicil read, he said, in substance, that

the same was what he wanted, and allowed the codicil to remain unaltered during a month or two in which he was physically and mentally competent to direct any change therein, they may infer therefrom that such codicil expressed the testamentary intentions, and therefore find a verdict in favor of the validity of the codicil upon all the questions submitted to them."

The answer of the court thereto was as follows, viz.: "I decline to affirm this point, and say, that although Mr. Neill's mind may at the time have been in a condition to fully comprehend the meaning and effect of the codicil, if his mind had become weak or impaired, it must be clearly shown, either that it was explained to him what the value of his estate was, and how much he was giving to Yardley, or that he fully understood the same without such explanation."

*Fourteenth.*—That the said learned judge erred in the answer which he made to the first point presented to him on behalf of the defendants.

The said point was as follows, viz.: "The plaintiff, John S. Yardley, having been the professional adviser of John L. Neill, and having drawn the codicil in question under which he receives a large benefit, if the jury believe that at the time of its preparation and execution the said Neill's mental powers were impaired from age, bodily infirmity, great sorrow, or other cause, without being so impaired to the extent of testamentary incapacity, it was incumbent upon the said plaintiff to prove affirmatively that the alleged testator was laboring under no mistaken apprehension as to the value of his property, and the amount he was giving to his confidential adviser, but that the gift was his free, intelligent act; and the evidence adduced on behalf of the said plaintiff being wholly silent upon these points, the verdict of the jury must be for the defendants upon the third issue in the cause."

The answer of the court thereto was as follows, viz.: "I affirm that point."

*Fifteenth.*—That the said learned judge erred in the answer which he made to the fourth point presented to him on behalf of the defendants.

The said point was as follows, viz.: "The fact that a will is written, or procured to be written, by a party who is largely benefited by it, forms a ground of suspicion against the instrument, and calls for clear and satisfactory proof that it contains the real intentions of the deceased, and especially so where the confidential relation of adviser and client exists, and the adviser frames the instrument for his own advantage and benefit."

The answer of the court thereto was as follows, viz.: "I affirm that point."

*Sixteenth.*—That the said learned judge erred in the answer made by him to a question addressed to the court by the jury on their third appearance after they had been sent out to make up their verdict.

The said question was as follows, viz.: "If Mr. Neill's mind was *at all* impaired on the 2d of December, 1876, was Yardley in that event obliged to acquaint Neill as to the probable amount which he, Yardley, would take under the residuary clause in the codicil? If such is the law in this case, would Yardley's failure to so acquaint Neill render the codicil null and void?"

The answer of the court thereto was as follows, viz.: "The Supreme Court has said that, if the mind has become weak or impaired, it is the duty of the scrivener to acquaint the testator with the value of his property, and with the amount the scrivener would take under the will. I can not undertake to draw a rule by which the degree to which a mind has weakened must be measured.

"If Mr. Neill's mind had become weak, such explanation by Yardley must be shown, to authorize the jury to find a verdict in favor of the codicil, or, as the Supreme Court has stated it, the jury must say whether the testator was, physically and intellectually, the same man when he executed the codicil, as when he made the original will."

The cause was argued March 24th, 1884, Trunkey, J., being absent, by *Robert N. Willson* and *George Junkin* for the plaintiffs in error, and by *George W. Biddle* and *William A. Porter*, for the defendants in error.

On April 7th, 1884, the Supreme Court made the following order:—

"And now, 7th April, 1884, a re-argument of this case is ordered. While we intend this order to apply to the whole case, yet we invite especial attention to the eleventh, twelfth and sixteenth specifications of error.

"Per Curiam."

The cause came on for a re-argument January 21st, 1885, all the justices being present.

(*Robert N. Willson*, of counsel for the plaintiffs in error, having been, in the meantime, elected a judge of the Court of Common Pleas No. 4, of Philadelphia County, did not take part in the oral argument).

*George Junkin*, for the plaintiffs in error.—It was error in the court to go outside the precept and frame the pleadings

and issue so as to compel plaintiffs to prove the negative of the proposition averring undue influence, &c.    The first issue, whether the paper was a valid codicil, raised a mixed question of law and fact and was therefore inproperly inserted in the pleadings, and should not have been left to the jury: Bitner v. Bitner, 15 P. F. S., 347; Landis v. Lyon, 21 P. F. S., 473; Cobb v. Burns, 11 P. F. S., 278.

With reference to the instructions of the court below on the question of the duty of a confidential adviser, who is a beneficiary under a will, to satisfy the jury of the absence of fraud &c., it is claimed by the other side that the judge followed the law as laid down in Cuthbertson's Appeal, 1 Out., 165.   But we respectfully submit that some of the language in the opinion of Chief Justice SHARSWOOD in that case was too broad, and has been qualified by this court in the more recent cases of Wilson v. Mitchell, 5 Out., 495; Caldwell v. Anderson, 8 Out., 199; and Wilson's Appeal, 3 Out., 545.   Further, that the court below, in its qualifications to our points, and in its reply to the inquiry of the jury asking further instructions, went beyond anything laid down in Cuthbertson's Appeal: Boyd v. Boyd, 16 P. F. S., 283, and Frew v. Clarke, 30 P. F. S., 170.

*W. W. Porter, A Sydney Biddle, H. J. McCarthy, George W. Biddle, William A. Porter*, for defendants in error.

Mr. Justice GREEN delivered the opinion of the court, October 15th, 1885.

The first assignment of error relates to the form of the issue.   The precept from the Orphans' Court directed an issue to be formed to determine—

"*First.* Whether the said certain writing dated December 2d, A. D. 1876, is a codicil to the will of said John L. Neill deceased.

*Second.* Whether at the time of the making of said alleged codicil the said John L. Neill was of sound disposing mind, memory and understanding.

*Third.* Whether the alleged codicil was produced by undue influence, fraud, imposition or duress."

Under this order pleadings were filed consisting of a narr. with three counts, each one charging a conversation and a wager upon one of the three foregoing several matters covered by the precept, a plea denying each of the assertions contained in the narr. and tendering issue upon all, and a similiter joining issue as to all.   The executors were made plaintiffs in the issue and certain of the legatees whose legacies were changed by the codicil were made defendants.   It is the executors who object to the form of the issue and not the legatees.   They do

[Yardley *v.* Cuthbertson.]

not complain that they were made parties and plaintiffs, nor do they indicate how they were harmed by the character of the pleading.   They contend that the pleadings should have been so framed that the defendants should have alleged the undue influence as a defence, and thus relieved the plaintiffs from the necessity of alleging and proving a negative, and they also argue that the question whether the paper in controversy was a codicil.is a mixed question of law and fact, which should not have been left to a jury.   Whatever might be our views abstractly upon these matter, it would not be proper for us to reverse the case on these grounds, because the original petition in the Orphans' Court prayed for an issue in this very form, and that court having refused the issue, we reversed the decree and directed " that the issue prayed for in the court below be granted."   Having done this the court below declined to change the form of the issue which the Orphans' Court, in obedience to our order had sent over to the Common Pleas for trial, and it would certainly not be correct for us now to reverse the Common Pleas for doing precisely what we directed to be done by the Orphans' Court. In Dotts *v.* Fetzer, 9 Barr,. 88, we said, " It is the business of the court which awards a feigned issue, to name the parties to it and prescribe the form of it; and as this was done by the Register's Court, the Common Pleas had no power to dispute it."   When the case was first before us (1 Out., 163,) on appeal from the Orphans' Court, no question was raised as to the form of the issue, and our attention was not called to the subject.   Even if we would have made a different order, had the matter been discussed before us, yet as we did in fact make the order awarding the very issue which has been tried, and the parties have upon the faith of it incurred the very great expense and trouble involved in so protracted a trial, we could not with any propriety reverse the proceedings and order another trial upon such a ground.   Application was made to us, after the second decision of the Orphans' Court in which the issue was ordered, asking us to change the issue but we declined to entertain it.

But if the question were an open one, so long as the executors are plaintiffs in the issue it is difficult to see how they are injured by the form adopted in this case.   It is in substance the issue *devisavit vel non* which has almost universally prevailed in this Commonwealth during the whole period of our jurisprudence.   That kind of issue is founded upon the idea that the executors assert and uphold the will, and that it is their business to establish it if it is questioned, and, being charged with this duty, they should be made parties and plaintiffs in the contest.   We have never yet formally decided

[Yardley *v.* Cuthbertson.]

that an issue *devisavit vel non* is illegal, and in view of the long
continued and unquestioned practice regarding them we could
not do so now. We are, however, of opinion that they are
altogether erroneous and ought to be abrogated. They are in
our judgment contrary to the principles of pleading and not
warranted by the law which authorizes them when they emanate
from the Register's Court formerly, or the Orphans' Court
now. That law, Act of 15th March, 1832, § 41, Purd. Dig.,
1256, pl., 22, permits only the granting of issues to try dis-
puted questions of fact. We have many times held that issues
for such purposes must designate specific facts, and mere con-
sistency requires that we should adhere to the same rule when
the disputed facts affect the validity of a will. We deny to
executors the right to employ and pay counsel out of the estate
in their hands for the trial of such issues, and yet we sustain
their right to be parties to them. The issue *devisavit vel non*
is not an issue to try any fact. The question is one of mixed
law and fact, proper only to be determined by a court after the
pure facts have all been found. It belonged to the Register's
Court formerly and the Orphans' Court now, after the certifi-
cate from the Common Pleas has come back showing how the
disputed facts have been found. The law presumes sanity and
freedom from undue influence as to all wills, and that presump-
tion prevails until the contrary is alleged and proven. He who
makes such allegations must prove them, and therefore the real
burden of proof is on him. Strictly, therefore, he should be the
plaintiff in the issue. As the executors, as such, have no in-
terest in the estate to be distributed, they have no business in
the issue and ought not to be parties to it. The parties actu-
ally interested in sustaining the will ought to be defendants in
the issue. With the contestant as plaintiff and the legatees as
defendants and an issue to try specific disputed facts only, a prop-
erly constituted litigation will be established consistent in, and
with, itself, conforming to the rules of pleading and evidence,
in proper subservience to the statute under sanction, and by
force of which it is conducted, and in all things satisfactory to
the requirements of the legal and judicial mind. These views,
however, are obiter dicta only, the question is not distinctly
before us, and they are expressed because the occasion has
suggested them, and in order that the attention of the profes-
sion may be attracted to the subject. In some parts of the
state the issues in will cases have been framed and tried in the
manner here suggested for many years and with entire satis-
faction to the bench and bar as we understand. We said in
Bitner *v.* Bitner, 15 P. F. S., 347 : " The looseness with which
feigned issues are so often formed is a source of frequent regret,
which we had occasion to notice last year in a case from Lu

zerne County. This case is another instance. The only issue presented by the pleadings is whether the writing was the last will and testament of Christian Bitner. But this presented no issue of fact. It might not have been his last will for various reasons of law and fact, as want of due execution, revocation, duress, insanity, &c. Such an issue withdraws the will from the exclusive jurisdiction of the Register, or Register's Court, and commits it to the Common Pleas, which has no jurisdiction except to try issues of fact only sent to it for a trial by jury." But these remarks also were obiter dicta only, as no assignment of error raised the question, and the form of the issue was not before us. It is satisfactory to notice that in framing the issue in the present case some progress is made in the right direction. It does distinctly set forth two specific facts upon which issue is joined and the cause tried. It is to be hoped the time may yet come when these issues will be ordered, framed and tried upon sound principles of pleading, and in accordance with the numerous decisions of this court, which determine the character of issues in other cases.

The objection that this issue required the plaintiffs to prove a negative in respect of the allegation of undue influence would not be serious if it were well taken, but it is not well taken. In substance it is an allegation that the codicil was made by the testator of his own free will and is no more negative in its character than the averment of sanity. The anomaly comes from making the wrong persons plaintiffs. If the plaintiffs are the persons who contest the codicil they, properly and affirmatively, allege insanity and undue influence and must prove whatever they allege. But if the persons who support the codicil are made plaintiffs and undertake to describe the issues, they do so by two affirmative allegations of sanity and free will, or two negative ones denying insanity and denying undue influence. In this respect the two averments are essentially alike. The first assignment of error is not sustained.

*Second, third and fourth assignments.*—There is a slight difference between the first of these three questions and the other two. But it is a difference apparent only and not real. The last two of the questions, covered by the third and fourth assignments, expressly assume the truth of the facts upon which the expert opinion is asked, while the first assumes it tacitly. The latter propounds a question upon the *sufficiency* of the whole of the plaintiffs' testimony as presented in the evidence, to enable the witness to determine the question of mental capacity. The truthfulness of the testimony is necessarily assumed, its sufficiency only being inquired of. Any other theory makes it meaningless and ridiculous. Of course it could not be sufficient if there is the slightest question as to its truth.

[Yardley v. Cuthbertson.]

The discussion of these three assignments is therefore practically the same. The question common to all, when succinctly stated is, can the opinion of an expert witness be asked and taken upon a mass of facts, actually proved on the trial of a case, upon the assumption that the whole is true. There is no question that if all of the same facts are grouped together in a hypothetical question the opinion may be taken. There is some contrariety of decision, though not much; on this subject, but our own cases and the weight of other authority appear to establish the admissibility of the evidence. In Pidcock v. Potter, 18 P. F. S. 342, the rule is thus stated—"Subscribing witnesses of course testify to the state of the testator's mind, and in addition to the facts give their opinion. The same is the case with medical men who, as experts may give their opinion upon hypothetical cases or upon the facts proved : 1 Greenleaf's Ev. § 440. In Pennsylvania it has always been the rule that after a non-professional witness has stated the facts upon which his opinion is founded he is permitted to state his opinion as to the sanity or insanity of the testator." In Forbes v. Caruthers, 3 Yeates, 527, we said—" Thus a physician who has not seen the particular patient may, after hearing the evidence of others, be called to prove on his oath, the general effects of a particular disease, and its probable consequences in the particular case."

In Detweiler v. Groff, 10 Barr, 376, we said—" In questions of science, skill and trade or others of the like kind, persons of skill, sometimes called experts, may not only testify to facts, but are permitted to give their opinions in evidence: 1 Green. Ev. § 440, their opinions are confined to their judgment on the facts proved."

In Olmsted & Bailey v. Gere, 4 Out., 127, which was an action of case for malpractice we reversed the court below for rejecting the following question put to a physician as an expert. Q. From the testimony you have heard as to the mode in which this limb was treated by Dr. Bailey, and from the results you find upon the limb was there any unskillful management on his part?" and held that an opinion derived from both sources was competent.

None of these cases presents the very question we are considering, but they proceed upon the idea, and affirm the doctrine, that an expert witness may be asked his opinion upon facts proved on the trial and heard by, or known to the witness. In Dexter v. Hall, 15 Wall., 9 however a decision was made which seems to cover every aspect of the question now before us. The matter involved was the sanity of one who had executed a power of attorney. Depositions had been taken on both sides some tending to show sanity and others

12 OUTERBRIDGE.—29

insanity. All of the depositions were read in evidence and were also read by a physician who was examined as an expert. He was then asked the following question—" From the facts' stated in these depositions and the symptoms stated, what in your opinion was the state of Hall's mind Dec. 27th, 1852, as to sanity or insanity." The plaintiffs objected to the witness expressing any opinion founded on the testimony adduced on *both* 'sides and the court sustained the objection permitting the witness however, to give his opinion upon the testimony adduced by the plaintiffs. The Supreme Court said that the only assignment " which has any plausibility, and which' needs particular notice is that which complains of the refusal of the court to permit a medical witness to give his opinion respecting the sanity of John Hall at the time when he signed the power of attorney basing his opinion upon the facts and symptoms stated in the depositions read at the trial. The witness was however allowed to give his opinion upon the testimony adduced by the plaintiffs. The record does not show fully what were the facts stated in the deposition, nor whether they were established by uncontradicted evidence. It may be therefore that, by the form in which the question was put the witness was required to give his opinion upon facts, but to ascertain and determine what the facts were. This of course was inadmissible. The rule is as laid down in Greenleaf's Evidence (§ 440), " If the facts are doubtful and remain to be found by the jury it has been held improper to ask an expert who has heard the evidence what is his opinion upon the case on trial; though he may be asked his opinion upon a similiar case hypotheti‑ cally " stated." The court proceeded to say that as the answer was favorable to the defendant he was not injured by the decision of the court refusing permission to 'let the witness answer upon all the testimony, and he could not complain, but it is plainly to be implied and the case is so reported, that the action of the court below was approved.

It seems to us that this is the true distinction upon which the question should be determined. The witness can not be asked to state his opinion upon the whole case, because that necessarily includes the determination of what are the facts, and this can only be done by the jury. But if either the facts are stated hypothetically in one question, or if the whole of the testimony delivered by one of the parties or by certain of the witnesses for one party is made known to the expert either by his reading it or hearing it, and he is then asked his opinion upon it assuming it to be true, in either case the opinion is sought upon an assumed state of facts, and may therefore be given. We can see no difference between the two modes of putting the question to the expert, except in the manner in

which the facts upon which he is to give his opinion are made known to him. In the one mode they are all repeated to him in the question and in the other he reads them or hears them testified to, but in both the essential requirements of assuming them to be true is enjoined. Thus the witness in either case determines none of the facts himself, and in both his opinion is based upon the assumption of their truth. The source of his information is different, but the information itself is the same, generically in both cases. Many cases have been ruled upon this distinction.

Thus in a very elaborate opinion in the case of Gilman v. Town of Strafford, 50 Verm., 723, where the questions propounded were upon the facts stated in depositions, the court said: "Where an expert hears or reads the evidence, there is no reason why he may not form as correct a judgment upon such evidence, assuming it to be true, as if the same evidence was submitted to him in the form of hypothetical questions, and it would seem to be an idle and useless ceremony to require evidence with which he is already familiar to be repeated to him in that form."

In Negroes, Jerry et al. v. Jeremiah Townshend, 9 Md., 145, the court said: "The question propounded to the witness was not his opinion upon the evidence submitted. By such a question it would be left to the witness to determine what testimony he would believe and what he would reject, and the degree of weight to be attached to each item of testimony submitted. But the question was 'upon the hypothesis that the testimony given by the witness in this case is all true,' then what would be the witness' opinion? By this interrogatory as thus put the witness is not permitted to weigh the testimony, but is required to assume it all to be true as stated. It is virtually, as we have said, putting a hypothetical state of the case to the witness upon which his opinion is to be given."

In Wright v. Hardy, 22 Wisc., 348, the action was for negligently performing the amputation of a limb, an expert witness was asked, "Suppose his (a witness whose testimony the expert had heard) statement relative to the amputation and his subsequent treatment to be truthful, was or was not the amputation well performed?" The court below rejected the question. The Supreme Court said: "For ourselves we can see no reasonable objection to it. The sole object of all rules upon the subject is that the questions shall be so framed as not to require the expert to give an opinion upon the credibility of the testimony and the truth of the facts, which are purely questions for the jury. The questions asked required no expression of opinion as to credibility of the testimony or truth of the facts deposed to by witness Knapp. . . . . . It follows therefore that the court erred in rejecting the questions."

In Getchell *v.* Hill, 21 Minn., 464, the issue was as to the treatment of a broken arm. The question was: "Having heard the testimony in this case and assuming it to be true, what in your opinion as a surgeon was the necessity . . . . . of the treatment?" The court said: "This form of question is not obnoxious to the objection that it calls on the witness to decide any question of fact for the purpose of basing the opinion upon it. It is in effect putting to the witness a hypothetical case which is admitted to be proper. In strictness the question should state the hypothetical case. We think, however, that the trial court may in its discretion, as a matter of convenience, permit the hypothesis to be put to the witness by referring him to the testimony if he has heard it instead of requiring the counsel to recapitulate it."

In Fenwick *v.* Bell, 1 Car. & Kir. 312, it was held that in an action of case for running down the plaintiff's ship a nautical witness may be asked whether, having heard the evidence and admitting the facts proved by the plaintiff to be true, he is of opinion that the collision could have been avoided by proper care on the part of defendant's servants.

A similar form of question was permitted by Lord ELLEN-BOROUGH in Beckwith *v.* Sydebotham, 1 Campb., 116.

In Commonwealth *v.* Rogers, 7 Metc., 500, Chief Justice SHAW, charging a jury in a homicide case where the defence was insanity, after defining the subject of expert testimony, said: "One caution in regard to this point is proper to give. Even where the medical or other professional witnesses have attended the whole trial and heard the testimony of the other witnesses as to the facts and circumstances of the case, they are not to judge of the credit of the witnesses, or of the truth of the facts testified by others. It is for the jury to decide whether such facts are satisfactorily proved. And the proper question to be put to the professional witnesses is this: If the symptoms and indications testified to by the other witnesses are proved, and if the jury are satisfied of the truth of them, whether in their opinion the party was insane, and what was the nature and character of that insanity; what state of mind did they indicate." In Hunt *v.* Lowell Gas Light Co., 8 Allen, 170, the plaintiffs called three physicians who had heard the testimony on the part of the plaintiffs which was not conflicting, and asked each of them this question: "Having heard the evidence and assuming the statements made by the plaintiffs to be true, what in your opinion was their sickness, and do you see any adequate cause for the same?" The defendants objected to the question, but it was allowed, and on error, the court, CHAPMAN, J., said: "The object of all questions to experts should be to obtain their opinion as to the matter of

[Yardley v. Cuthbertson.]

skill or science which is in controversy, and at the same time to exclude their opinion as to the effect of the evidence in establishing controverted facts. Questions adapted to this end may be in great variety of forms. If they require the witness to draw a conclusion of fact, they should be excluded. The question put in Sills v. Brown, 9 C. & P., 601, was of this character and was rightly excluded. But where the facts stated are not complicated, and the evidence is not contradictory, and the terms of the question require the witness to assume that the facts stated are true, he is not required to draw a conclusion of the fact. In the present case the question allowed to be put does not seem to us to require of the witnesses anything more than a scientific opinion, and we do not understand the answer to include anything more than this." Without enlarging this opinion by further extended citations it is sufficient to say that similar rulings were made in Fairchild v. Bascomb, 35 Verm., 398 ; People v. Thurston, 2 Parker's Crim. Rep., 133 ; Kempsey v. McGinnis, 21 Mich., 139 ; State v. Lautenschlager, 22 Minn., 521 ; Rex v. Searle, 1 M. & Rob., 75 ; Heald v. Thing, 45 Maine, 396 ; McNaghten's Case, 10 Clark & Finelly, 198 ; and in Ray's Medical Jurisprudence of Insanity, (5th ed.) §§ 638 to 650, the same doctrine is stated and defended with elaborate argument and numerous citations. We have carefully examined the cases cited by the learned counsel for the plaintiffs in error and do not find that they materially conflict with the cases above referred to, or the doctrine they announce. Those of them which hold that an expert witness properly qualified can not be asked whether in his opinion the alleged testator was mentally competent to make a will can not be regarded as of any authority in this state where the opposite doctrine has always prevailed, and it is no longer an open question.

Those of them which relate to the question we are considering were in the main, decided upon some special reason not in hostility with the cases above cited, as for instance because the question required the witness to pass upon all the testimony in the case, or to infer the facts or some of them, or the assumption of the truth of the facts to be considered was omitted, or the question was so framed as to require the witness to determine the credibility of the testimony or some part of it, or the testimony upon which he was to pronounce was in itself contradictory.

After a careful review of the whole subject we have reached the conclusion that the questions we are considering, not asking the witness to express an opinion upon the whole of the testimony, but only upon a defined portion of it, that testimony not being contradictory in itself and its truthfulness

being· expressly ·assumed, the witness being first made ac-.quainted with the whole of it upon which he was to pronounce, were competent questions which might be lawfully put and an-.swered.  It is scarcely necessary ·to say that there is nothing in· the case of Coyle· *v.* The Commonwealth, 8 Out., 117, in conflict with these views.  The second, third and fourth assign-ments are not sustained.

*Fifth, sixth, seventh, eighth and ninth assignments.*—An examination of the record shows that the witnesses had been examined and fully testified in chief upon the subjects covered .by the questions whose rejection is complained of in these assignments. · At the very best their admission was subject to the discretion of the court below which we would not review: Young *v.* Edwards, 22 P. F. S., 264; Gaines *v.* Com., 14 Wr., .329; Aiken *v.* Stewart, 13 P. F. S., 33.

·. *Tenth assignment.*—We could not possibly sustain this assignment without reversing all that we have decided in Boyd *v.* Boyd; Frew *v.* Clarke; Cuthbertson's Appeal and kin-dred cases on the subject of confidential advisers writing wills under which they take large benefits.

. *Eleventh assignment.*—The fourth point of the plaintiffs was as follows:  " If the jury believe from the evidence that Mr. Neill was of sound mind when the codicil was made,·and him-self suggested or directed the alterations in his will which are ·contained in the codicil and the residuary clause contained therein, no presumption arises against the validity of the codi-.cil because of the relation in which Mr. Yardley stood to Mr. Neill in the drawing and execution of the codicil."  The answer of the ·court was as follows:  " This point is af-firmed, with this qualification, that it is always ground for suspicion where one holding confidential relations to a testator prepares for and directs the execution of a will under which· he takes a considerable interest, and that the .obligation· rests on such confidential agent to show by clear and satisfactory proof that the testator fully understood the .1estamentary disposition of his property as it may be, expressed .in the will or codicil."

·  The error assigned is that the point should have been but was not affirmed absolutely and without the. qualification. ·

There is no doubt that the point as expressed is sound and · might have been affirmed without any qualification.  But the question with which we have to deal is,·was it error· to add the qualification.  The point was stated hypothetically, which was the proper way of stating it, but there was highly contro-verted evidence as to the truth of the facts expressed in the hypothesis.  The jury has found that. Mr. Neill was not of .sound mind when the codicil was made, and the only evidence

of express direction was flatly contradicted by a witness having no interest in the disputed clause.

In the light of such a verdict we must assume there was evidence of mental unsoundness given to the jury and the record shows such to be the fact. It was entirely undisputed that the person who wrote the codicil was by its provisions made the legatee of almost four fifths of the estate, when the will, written by the testator himself when he was thoroughly master of his faculties, contained no such provision nor anything at all approaching it, or similar to it. It was also the fact that the codicil reduced certain legacies given by the will from $175,000 to $35,000, and that nothing was said to the testator indicating what proportion of his estate would go to the scrivener under the codicil which the latter prepared. In these circumstances it can not be said that there was any impropriety or unseemliness on the part of the learned judge who tried the cause, in annexing to the affirmative answer which he gave to the point, a suitable cautionary qualification.

It is common practice to do so, and in many cases it is desirable, and in some, necessary. Of course it is essential that the qualification shall, itself, be free of error. In the present case the only material inquiry is, was the matter stated in the qualification erroneous or sound in a legal sense. The weight of the argument for the plaintiffs in error is that the court charged in the qualification that although the facts supposed by the point created no presumption against the validity of the codicil yet "Mr. Yardley must show by clear and satisfactory proof that the testator fully understood the testamentary disposition of his property, because it is ground for suspicion when Mr. Yardley prepared the codicil for Mr. Neill which gave him a considerable interest and directed its execution. Why a suspicion if under such circumstances there was no presumption against the validity of the codicil. Why must Mr. Yardley prove by clear and satisfactory evidence that this entirely sound-minded man who 'suggested and directed the alterations' which gave Mr. Yardley 'the considerable interest' really understood the testamentary disposition he suggested or directed, if there was no presumption against the validity of the codicil made under such circumstances. The very foundation of the qualification thus made is the thought that the presumption is that the codicil is the will of Mr. Yardley and not the will of Mr. Neill and he must, therefore, by clear proof overcome this presumption and show that Mr. Neill understood the whole thing and meant to give Mr. Yardley the considerable interest. Why must Mr. Yardley show all this? Because the law under the circumstances stated presumes that Mr. Yardley as the confidential agent

[Yardley *v.* Cuthbertson.]

of Mr. Neill controlled his mind. The law presumes the codicil invalid until Mr. Yardley by due proof rebuts this presumption. This is what the learned judge meant and told the jury. If the learned judge had really told the jury all this in answering the point, his language would have been amenable to the criticism made upon it. But he did not so tell them. The fallacy of the argument lies in overlooking the fact that while the point and the answer affirming it were in the concrete, the qualification was in the abstract only. The point applied a particular hypothesis directly to Mr. Neill and Mr. Yardley by name and this the court affirmed. It said that if *Mr. Neill* was of sound mind and himself suggested or directed the alterations in the will, no presumption arose against Yardley on account of his relation to Neill. This was what the court affirmed. What the court added was a purely abstract proposition not applied to the individuals named or either of them. The point and answer were personal, the qualification was impersonal. Unless therefore the impersonal and abstract proposition contained in the qualification was erroneous there was no error in its utterance. What was that proposition? This—" That it is always a ground for suspicion where one holding confidential relations to a testator prepares and directs the execution of a will under which he takes a considerable interest." Is not this sound law? If it is not the writer has strangely misread the cases. The learned judge must be treated with fairness. He had most abundantly presented the entire subject in his elaborate and exhaustive charge, and with so much satisfaction to counsel that not a single assignment of error is made to any part of the general charge. Here he must be judged by the very words he uttered and by nothing else. Arguments that he said what he did not say or that he meant what his words do not necessarily import are not sufficient, they can not persuade. The one fact declared in this sentence of the qualification, is, that one holding confidential relations to a testator prepares and directs the execution of a will under which he takes a considerable interest, and the one inference from that fact which is expressed, is " that it is always a ground for suspicion."

These words do not say that the fact stated created a presumption of invalidity against the will, they do not say even that it shifts the burden of proof. They say only that it is a ground of suspicion. Surely this is not error. If it is not a ground of suspicion it must be an indifferent fact, of no consequence in, and of, itself. But all the cases and text writers so pronounce it. The innate sense of morality and of right which underlies all law so declares it. Whether it is suspicious when associated

with other facts depends upon what those facts are. But this particular language we are considering treats it by itself, without any association with other facts, and so regarded, it certainly expresses a legal truth. The remainder of the qualification declares "that the obligation rests upon such confidential agent to show by clear and satisfactory proof that the testator fully understood the testamentary disposition of his property as it may be expressed in the will or codicil."

Undoubtedly this is correct. The confidential agent who wrote the will may discharge this obligation by showing that the testator was of sound mind, and himself directed the terms of the will, as was said in the plaintiff's fourth point, or he may show that the precise meaning and import of the gift to the scrivener, were explained to the testator so that he thoroughly understood it, and that he knew and understood the condition of his estate and the proportion which would be taken by the scrivener. With all this the language of the qualification did not deal. It was not considering or discussing that subject, it merely asserted the existence of the obligation in question as a result of the one fact previously stated. What effect would result if the testator's mind was weak and no explanation was made, had been fully discussed in the general charge, and of that no complaint is made. Generally the rule is announced in connection with the facts which gave occasion for its utterance, and as ordinarily stated, the fact that the scrivener took a large interest under the will if the testator was of weak mind, and no explanation of the condition of the estate or the amount of the gift was made, is much more than a suspicious circumstance. It is a controlling fact and determines the case against the scrivener.

If we turn to the authorities it will be apparent that the court below did not transcend them in using the language we are now considering. Thus in Redfield on Wills, 515, the writer says : "Where the party to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation. Thus where a will was written by an attorney or solicitor who is to be benefited by its provisions it was considered that this circumstance should excite stricter scrutiny and required clearer proof of capacity, and the free exercise of voluntary choice." The whole of this language was embodied and adopted in the opinion of this court in the case of Boyd v. Boyd, 16 P. F. S., 283.

In Dean v. Negly, 5 Wr., on p. 317, LOWRIE C. J. speaking of the relations of attorney, guardian, and trustee, and of persons using them for their own advantage, says : "In their legitimate operation, those positions of influence are respected; but

where apparently used to obtain selfish advantages they are regarded with deep suspicion."

In the case of Harrison's Appeal, 4 Out., 458, the very able opinion of Judge ELWELL was adopted as the opinion of this court. That learned Judge discussing this very question of the effect of the fact we are considering, upon the validity of a disputed testamentary writing says: "On this branch of the case then it only remains to inquire whether the will is rendered invalid by the fact that the scrivener is himself a legatee in trust for others, and that his wife, the daughter of the testator, is a legatee of the larger portion of the estate. It would be profitless in this connection, to trace the law on this subject from the civil law down through the varying decis- ions of the courts to the present time. The rule in England at the present day is, that when a person prepares a will with a legacy to himself, it is at most a suspicious circumstance of more or less weight according to the facts of each particular case, in some of no weight at all, varying according to the circumstances, such as the quantum of the legacy, and the proportion it bears to property disposed of, but in no case amounting to more than a circumstance of suspicion, demanding the vigilant care and circumspection of the court investigating the case. If there is no proof beyond the fact that the will was drawn by the legatee, the suspicion in ordinary cases would be removed by the fact of execution with knowledge of, and assent to the contents of the instrument: Barry *v.* Butlin, 1 Curt., 637 ; Durling *v.* Loveland, 2 Id., 225."

In Butlin *v* Barry, 1 Curt., 614, the court said: "Now the principles applicable to such a case are to be collected from a variety of cases in this court sanctioned by other courts: (Paske *v.* Ollatt, 2 Phil., 323; Ingram *v.* Wyatt, 4 Hagg. Eccl. Rep., 384), and other cases founded upon precedents in the earliest times, the result of which is, that where a paper has been drawn up by a person for his own benefit, or when he takes a considerable benefit under it, the presumption lies strongly against the act, and it requires to be proved by satis- factory evidence dehors the instrument that it was the free and voluntary act of a capable testator and executed with a full knowledge of its contents and effect."

When this case came up on appeal as Barry *v.* Butlin, 1 Curt., 637, the Court, Mr. Baron PARK delivering the opinion, said, " The rules of law according to which cases of this nature are to be decided do not admit of any dispute so far as they are necessary to the determination of the present appeal. . . . . . The second (rule) is that if a party writes or prepares a will under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court and calls

[Yardley v. Cuthbertson.].

upon it to be vigilant and jealous in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased."

In Billinghurst v. Vickers, 1 Phill., 187, the court said : " The presumption also is strong against an act done by the agency of the party benefited. The act is not actually defeated as it was by the civil law, provided the intention can be fairly deduced from other circumstances. Though the court will not presume fraud it will require strong proofs of intention."

In Paske v. Ollatt, 2 Phill., 323, it was said : " The court is always extremely jealous of a circumstance of this nature; By the Roman law *qui se scripsit heredem* could take no benefit under a will. By the law of England, this is not the case, but the law of England requires in all instances of the sort that the proof should be clear and decisive. The balance must not be left *in equilibrio ;* the proof must go not merely to the act of signing but to the knowledge of the contents of the paper. In ordinary cases this is not necessary, but where the person who prepares the instrument and conducts the execution of it, is himself an interested person his conduct must be watched as that of an interested person ; propriety and delicacy would infer that he should not conduct the transaction."

In Drake's Appeal, 45 Conn., 21, it was said : " The amount of proof required varies with the circumstances. If the interest is small in proportion to the whole estate and the decedent at the time of making the will was in health and in the possession of his faculties, slight proof will suffice. On the other hand, if his mind is feeble and the party drawing the will takes a considerable portion of the estate to the exclusion of heirs, proof of the most conclusive nature will be required."

There is nothing in any of these utterances at all in conflict with the decisions of this court. On the contrary they are quite in harmony with all we have said upon the general subject. Because we have said in cases where the facts were present, that where a " testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow, or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken, receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the disposition contained in it," it must not be inferred that we either said or implied that where a confidential agent acting as scrivener for a testator prepares and superintends the execution of a will under which he re-

ceives a large benefit, that fact is not to be regarded as even a circumstance of suspicion against the scrivener unless all the other facts stated accompany the transaction. It undoubtedly is a circumstance of suspicion in any case standing by itself alone, and the question how far it is to be efficacious in determining the validity of the testament, depends upon how far the other facts stated were present, and upon the character and the sufficiency of the explanation furnished by the scrivener. If these are not satisfactory to the judicial mind the fact which was a circumstance of suspicion becomes the basis of an adverse judgment.

It is almost unnecessary to add that this rule is a rule of general application to all kinds of instruments, the procurers of which are large beneficiaries by virtue of their operation. It is a rule of equity and is of very ancient origin. In its ordinary statement the fact of mental weakness in the grantor does not appear, and is not at all necessary to the application of the rule in a given case. Many if not most of the judicial illustrations of its application are devoid of this element: Huguenin *v.* Baseley, 14 Ves., 273, is a noted instance of this class, and it has been many times recognized and followed as authority by this court. In the admirable and exhaustive notes of Hare & Wallace to that case, appearing in 2 Lead. Cas. in Equity, Part 2, p. *430, numerous instances of a similar character are cited and discussed, in which the fiduciary relation of the beneficiary was the chief basis for equitable intervention, mental weakness being quite subordinate. Of course where mental weakness is present the burden of the confidential beneficiary is vastly increased, and it may determine the case against him when the other facts might not be sufficient. After a very extended reading of the cases the writer feels justified in saying that in all of them the confidential relation of the beneficiary to the benefactor is a most important element of the inquiry and in none of them is it regarded as less than a circumstance of suspicion requiring explanation. The eleventh assignment is not sustained.

The same considerations apply to the *fifteenth assignment* and require its dismissal.

*Twelfth Assignment.*—The plaintiffs' fifth point asked a binding instruction to the jury to find in their favor absolutely if they believed Mr. Neill was of sound mind and knew the contents of the codicil when he executed it. The court could not do this without ignoring entirely the issue of undue influence, which was granted by the Orphans' Court after this court had declared that there was evidence enough in the case to carry that question to the jury. It was the positive duty of the court below if the point was affirmed, to qualify it so as

to leave the question of the free will of the testator still with the jury. It would have been clear error if this had not been done. It is quite too narrow a view of the language of the qualification to say that it presented to the jury a question of actual coercion or constraint. It left to them the whole question of the free execution of the codicil without any species of coercion or constraint from any source. This of course includes the kind of coercion which results from the use of undue influence. As a legal proposition the answer to the point is undoubtedly correct. The only objection made to it is that it suggested or rather referred to the jury a question of which there was no evidence, to wit, actual coercion. We do not so understand it. The kind of coercion which consists of undue influence was most fully and correctly explained to the jury in the general charge, and there was no danger of their being misled upon this subject by the language used in the qualification of the answer. The twelfth assignment is not sustained.

*Thirteenth assignment.*—The eighth point of the plaintiffs asked the court to say that if the will and codicil were read to Mr. Neill by his direction after they were executed and he was in a condition of mind to fully comprehend the meaning and effect of the codicil, and after hearing them read he said in substance it was what he wanted, and allowed the codicil to remain unaltered for a month or two while he was competent to direct a change therein, the jury might find for the plaintiffs on all the issues. The court declined to affirm the point, saying that although Mr Neill's mind may have been in a condition to fully comprehend the meaning and effect of the codicil, yet if his mind had become impaired it must be clearly shown, either that it was explained to him what the value of his estate was, and how much he was giving to Yardley, or that he fully understood the same without such explanation. We can not possibly see any error in this. The attempt of the point was to substitute a general knowledge of the meaning and effect of the codicil, for that precise and definite knowledge of the condition and amount of the estate, and the proportion of it which the confidential beneficiary was to take, which the courts have said, many times over, the testator must have in order that the testament may stand. As we understand and have repeatedly declared the law, a capacity to understand the meaning and effect of a will may co-exist with its invalidity, if the testator was of weak mind, and the principal object of his bounty was his confidential agent who wrote it. This consideration fully justified the court below in the answer given to the point. The thirteenth assignment is not sustained.

*Fourteenth assignment*—The first point of the defendants expresses in substance, and almost in words, the ruling of this court in Cuthbertson's Appeal and therefore it was not error to affirm it. The concluding sentence is not drawn with perfect accuracy, as it seemingly asks for a peremptory instruction to find for the defendants on one of the issues. But this sentence is preceded by a hypothesis as to the mental condition of the testator at the execution of the codicil, and we assume as counsel on both sides and the court below did, that the conclusion was based upon the truth of the hypothesis. In this view the affirmance was correct as it is entirely without question that Yardley gave no explanation to Neill when the codicil was executed or at the previous interview, either of the condition or value of Neill's estate, or of the proportion of it which the codicil gave to Yardley. The assignment is not sustained.

*Sixteenth assignment*—Complaint is made of the answer given by the court to the question asked by the jury, partly because the court did not define more precisely the degree of mental weakness on the part of the testator which would cast the duty of explanation upon Yardley, and partly because of the concluding sentence of the answer as to whether Neill was the man he was when the will was made. If the court had said to the jury that they should find for the defendants if they found that the testator was not the same man physically and mentally when he made the codicil as when he made the will, such direction would have been open to serious objection. But the court did not say this. The question was, " If Mr. Neill's mind was *at all* impaired on the 2d of December 1876, was Yardley in that event obliged to acquaint Neill as to the probable amount which he, Yardley, would take under the residuary clause in the codicil? If such is the law in this case would Yardley's failure to so acquaint Neill render the codicil null and void?" The answer was: " The Supreme Court has said that if the mind has become weak or impaired it is the duty of the scrivener to acquaint the testator with the value of his property, and with the amount the scrivener would take under the will. I can not undertake to draw a rule by which the degree to which a mind has weakened must be measured. If Mr. Neill's mind has become weak such explanation must be shown, to authorize the jury to find a verdict in favor of the codicil, or, as the Supreme Court has stated it, the jury must say whether the testator was physically and intellectually the same man when he executed the codicil as when he made the original will." This question was asked with reference to the facts of this case and we think the correctness of the answer must be determined by a con-

sideration of those facts.  If the legacy to Yardley had been a few hundred, or even a few thousand, dollars, and the amount was expressly stated, it is apparent that a low degree of mental power on the part of the testator would have sufficed to understand and comprehend it, and to estimate the proportion it bore to the rest of the estate.  If Yardley had really rendered valuable services to Neill, and Neill had expressed a sense of obligation for them, and a desire to reward him in his will, it would be still more apparent that a low grade of intellectual force would have been sufficient for the appreciation of a gift in his favor especially if the amount of it were named. If Yardley had been interested in the residue under the will, which undoubtedly expressed Mr. Neill's intelligent consciousness of the disposition of his estate, it could at least have been said that the testator certainly intended he should have some part of the residue, and it would then only have been necessary that he should be mentally able to understand the difference between the part given by the will and that given by the codicil.  But none of these facts existed.  The change made by the codicil was vital in all respects.  It created a new and entirely different distribution of the testator's estate from that established by the will.  Legacies given to friends and to charities, upon the most deliberate and thoughtful purpose, when his affections, his instincts of philanthropy, his well informed conscience, his personal desire dominated his intelligent action, were stricken down without any assigned, indeed without a conceivable, reason.  Gifts which he certainly did desire to make to the extent of $175,000, when he knew his own mind, were reduced to one fifth part of that sum without a word of explanation, without the slightest intimation that he was in the least degree dissatisfied with his former purpose.  But over and above and beyond all these considerations, the vast residuum of the estate constituting nearly four fifths of its bulk, was given by the codicil to one who would not have received a dollar of it by the will.  And that one was the adviser, the confidential agent, the selected and trusted scrivener who wrote the codicil, and who wrote himself into it in such a fashion as to take almost the entire substance of the estate.  It was neither a small nor an ordinary estate.  It consisted of many items of personalty and of realty.  In its aggregate it represented a very large sum of money, more than $400,000.  Did Mr. Neill know and understand when he executed the codicil, that he was giving to Mr. Yardley nearly the whole of this great estate, that he was taking away from his former legatees four fifths of the sums which he gave them when he well knew his own desire?  If he did, he had the undoubted right to do just as he pleased

and no man could gainsay his action. But if he did not, the law protects him though he did not protect himself. In such circumstances as these the law is very jealous indeed. In conducting its inquiries it increases its precautions and the severity of its tests, in proportion to the increased gravity of the facts and the magnitude of the interests involved. Such is the teaching of all the cases. In this case the question we are considering is how much mental impairment was required to cast upon the scrivener, who took the bulk of the estate under a codicil, written by himself, when that codicil totally changed the provisions of a previous will in this respect, the duty of explaining to the testator the meaning and effect of the codicil, and the proportion of the estate which he would probably take under its provisions. The learned judge answered the question by saying he could not draw a rule by which the degree to which the mind was weakened must be measured in such circumstances. He repeated the rule so often stated by this and other courts that if the mind has become weak or impaired, it is the duty of the scrivener to acquaint the testator with the value of his property, and with the amount the scrivener would take under the will. Clearly there was no error in this. Who can fix by a defined rule the amount of the mental weakness which shall impose the duty of explanation in such a case? It is not possible to state a rule which would be applicable to all cases alike, and the circumstances of this case are of so very peculiar a character, that if the learned judge had said that any mental impairment which was appreciable would cast the duty of explanation upon the scrivener he would scarcely have been in error. In Wilson *v.* Mitchell, 5 Out., on p. 505, we said, " in the case of an old, infirm and mentally weak man, disposing of his estate in favor of his confidential adviser, the general rule that testamentary capacity and knowledge of the disposition made are presumed, does not apply. There should be very clear evidence of mental capacity, and proof independent of the execution of the will that Mr. Dougal's mind was free, and unbiased by the counsel, advice or influence of Mr. Mitchell in so executing it. The beneficiary himself is a competent witness and can not complain that the rule is hard or unjust, which requires him to make it clearly appear, that the gift to him was the free intelligent act of the testator." The learned judge in the court below went no further than this. It is not necessary to go beyond the testimony of Mr. Yardley himself to learn that no word of explanation was offered by him to Mr. Neill upon this most important subject. And it is not easy to understand the facts attending the preparation of the codicil, just as they were stated by Yardley, except upon the theory of very considerable mental impairment on the part

[Yardley v. Cuthbertson.]

of Mr. Neill from the time he made his will. It is incredible that he would have made such extraordinary changes in his will without the slightest comment or explanatory remark unless his mental faculties had become considerably impaired. Upon Miss Lambert's account of the transaction such a conclusion cannot be resisted.

What the learned judge said in conclusion about the jury finding whether the testator was physically and intellectually the same man when he executed the codicil as when he made the original will, was preceded in the same sentence by the hypothesis that he had become of weak mind. It was a mere repetition of the very same expression used by him in the general charge, and used in such a manner and with such precise and definite explanations that no assignment of error has been made to it, or could be, with any hope of success. It is but fair to the court below to consider what he there said on the same subject in connection with what was said in answer to the question of the jury. The defendants' second point asked the court to say that if the jury believed that Neill was not the same man physically and intellectually when he executed the codicil as when he made the will, the burden of proof was thrown upon Yardley to prove that Neill fully understood the value of his property and the probable residue after paying all his legacies. This the court declined to do, saying, "I decline to affirm this point as it is stated. It is a question of fact for the jury to say whether the mental faculties of John L. Neill had failed: his physical condition is comparatively unimportant except as connected with, or causing a failure of mental powers." In the general charge the court, after explaining most carefully and correctly the effects of the possible weakening of the testator's mental powers and the duty which in that event was cast upon Yardley, proceeds thus, "This case you will therefore see hinges to·a great extent on the possession by the testator of a mind that had not weakened or become impaired on the 2d of December, 1876; this implies the retention of memory, understanding and will, and is therefore to be decided mainly by the evidence in the cause which bears directly or indirectly on this question. If you believe it has been shown that the testator's mind had not become impaired, that his memory and understanding retained their full powers, that his will was as resolute and unyielding as before he was stricken with what Dr. Drysdale characterizes as an incurable malady, your way would seem to be clear in rendering a verdict in favor of the plaintiffs on all the issues. . . . . . On the other hand, if the evidence satisfies you that testator's mind was weakened, that he had gone down both physically and mentally under the afflictions which fell upon

12 OUTERBRIDGE.—30

him, or, as the Supreme Court say, if this inquiry leads you to the belief that mentally and physically he was not the John L. Neill as when he wrote the original will of 1874, then you are to say whether all that the law in such a case requires has been made to appear. . . . . . . Is there any other evidence in the cause that shows clearly that though his mind had weakened, his memory and understanding was sufficiently strong and clear to have enabled him to understand the nature of his testamentary dispositions and that he did in fact fully and beyond question understand them." It is difficult to understand how the court could have defined more minutely or intelligently the limitations of the subject, than was done in the foregoing language. That it was correctly done is intrinsically evident, and the very able counsel for the plaintiffs in error have shown their appreciation of this by taking no exception and filing no specification of error to it. And yet in substance the answer given to the question of the jury is the same. The question did not relate to the issue of sanity on which the verdict for the defendants was rendered, and on the other issue it related only to the question of Yardley's duty, which was apparent upon almost any view of the testimony it is possible to take consistently with the extraordinary facts which are quite undisputed. The sixteenth assignment is not sustained.

Judgment affirmed.

MERCUR C. J. and CLARK, J. dissented.